## THOMAS *v.* WESTERN CAR COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 196. Argued March 30, April 3, 1893. — Decided April 24, 1893.

A debt due from a railroad company to a car company for rental of cars prior to the commencement of a suit to foreclose a mortgage on the road and the appointment of a receiver, is held not to be a preferred debt, having priority over the mortgage debt.

A similar debt accrued during the receivership is examined, and is settled as to amount and allowed.

The car company in such case is not allowed interest.

After property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the fund.

THIS is an appeal from the decree of the Circuit Court of the United States for the Northern District of Illinois, in a proceeding to foreclose a mortgage executed by the Peoria and Rock Island Railway Company to secure its first mortgage bonds to the amount of $1,500,000.

The original bill was filed in October, 1874, by Veeder G. Thomas, Daniel R. Thomas and Thomas B. Simpson, citizens

96 OCTOBER TERM, 1892.

of the State of New Jersey, as holders of certain mortgage
bonds, and on behalf of all of the holders of such bonds.
Among others it made the trustee in the mortgage given to
secure the bonds, and William R. Hamilton, Benjamin E.
Smith and William Dennison, defendants, and, beside setting
forth the default in the covenants of the mortgage, charged,
among other things, that these mortgage bonds were issued,
as it was represented, for the purpose of constructing and
equipping the said railroad, and that they were placed upon
the market for general sale by the firm of Turner Bros.,
bankers, of the city of New York, who assumed and repre-
sented themselves to be the financial agents for the railway
company, and, as such agents, represented by pamphlets,
statements, and otherwise that the road of the said railway
company was a completed road, built by subscriptions to its
capital stock; that the capital stock, amounting to $2,000,000,
had all been paid in; that the said road was open and being
operated successfully; and, finally, that the said bonds were
offered for sale by the said company for the purpose of plac-
ing upon the road the equipment necessary for the business
offered, and to construct cars, engines, depots, and machine-
houses, such as were required by the business of the com-
pany.

The bill charges that the complainants purchased and be-
came the holders of their bonds in reliance upon these repre-
sentations, and that the entire issue of bonds was sold by
Turner Bros. under like representations; that these represen-
tations were in fact false and fraudulent ; and that the officers
of the railway company and the defendants, Smith, Dennison,
and Hamilton, directed and authorized them to be made,
knowing them to be false. It is charged that in June, 1870,
while Hamilton was president of the railway company, a con-
tract was made with Smith and his associates for the con-
struction of the railroad, and that Dennison was one of the
associates of Smith in this contract; that by the terms of the
contract Smith and his associates agreed to iron, depot, and
moderately equip with rolling stock the railway, and the rail-
way company was to deliver to him, for himself and associates

$1,250,000 of the capital stock of the company, and the entire $1,500,000 of the first mortgage bonds; that the $1,250,000 of the capital stock was immediately upon the making of the contract issued and delivered to Smith for himself and his associates, being a large majority of all of the capital stock of the company, and that Smith and Dennison and their associates thereby obtained absolute control of the management of the railway company, and caused such officers and directors to be elected as were friendly to their schemes and in their control; that the road was insufficiently constructed and insufficiently equipped on the part of Smith and his associates; that, desiring to sell the bonds, and having control of the management of the company, Smith and his associates fraudulently caused the bonds to be offered for sale through Turner Bros. as the financial agents of the railway company, and as for its benefit upon the said representations, and that in fact the bonds were not put upon the market and sold for the benefit of the railway company, and it was not intended or expected to use the proceeds thereof for the purpose of placing the necessary equipment upon the road as was represented, but, on the contrary, the entire proceeds of the bonds were received by and divided among Smith and his associates, and that the railway company has never had any other or greater equipment of rolling stock than that furnished by Smith under his construction contract before the sale of the bonds.

The bill charges further that in 1871, owning and controlling the capital stock of the railway company, Smith and his associates caused Smith, Dennison, and Hamilton, and others in their interest, to be elected directors, Hamilton to be elected president, and Smith to be elected vice-president of the railway company, and that as such they continued to control the affairs of the railway company down to the time of the filing of the bill.

Among other charges of fraud in the bill it is charged that Smith, Dennison, and others of the directors of the railway company had caused the railway company to hire cars from the Western Car Company at an exorbitant rate, and that these contracts for the use of cars were made and continued

by reason of the control of Smith and his associates over the affairs of the railway company.

The bill sought a foreclosure of the mortgage and prayed for the appointment of a receiver.

On the 23d of January, 1875, an order was entered appointing John R. Hilliard receiver of the Peoria and Rock Island Railway Company and its property, and on the 1st of February, 1875, Hilliard, as receiver, went into the possession and into the operation of the said railway. Hilliard remained in control and operated the railroad until after its sale in 1877, and until possession was delivered by him, under the order of court, to the purchasers who had become organized as the Rock Island and Peoria Railroad Company, and who have ever since operated this railroad.

A decree of foreclosure was rendered on the 11th day of January, 1877. It directed a sale to be made by the master in chancery of the franchises and property of the railway company. It contained directions as to the application of the proceeds of the sale, ordering, among other things, that, after payment of specific sums provided for, the balance should be paid to the clerk of the court, who should apply the same, under the direction of the court, first, to the payment of all remaining claims of intervening creditors, as they should be allowed by the court, and next to the payment of the bonds and coupons secured by the mortgage, which should be outstanding and unpaid. It authorized the master to receive from the purchaser or purchasers, after payment of the sum of $100,000 of the amount of his bid, for the balance of the sum bid, in lieu of cash, outstanding and unpaid bonds and coupons at such percentage as the court should direct on the approval of the sale; and it authorized the purchaser or purchasers of the property and franchises of the railway company to reorganize under and by virtue of the provisions of the charter of the said railway company, and to be invested with all the rights, franchises, privileges, and powers of the said railway company.

On September 17, 1877, an order was entered approving the master's report of sale, and ordering that the sale made

to Ransom R. Cable for $550,000 be confirmed. The purchaser Cable was directed by this order to deposit all such bonds and coupons as he should desire to pay in on account of the purchase with the clerk of the court. The court also ordered that all petitioners for allowance of intervening claims complete their proofs of such claims by the 1st of October, 1877.

On the 14th of December, 1877, an order was entered by the court approving the report of the master, showing the execution of a deed by him of the property under the foreclosure decree to the Rock Island and Peoria Railway Company, in pursuance of an order entered on the 11th of December, 1877, and approving the deed, a copy of which is set forth in the order. This order also approved penal bonds in the sum of $100,000 each, payable to the clerk of the court, for the use of whomsoever should become interested, one of such bonds being expressly conditioned for the payment to the Western Car Company of any amount which should be found due to it, reciting the intervention of that company and the claims asserted by it against the proceeds of the sale of the property of the railway company.

The original intervening petition of the Western Car Company in this cause was filed on the 11th of December, 1876. It asserted that at the time of the appointment of the receiver the railway company was indebted to the car company in the sum of $35,106.49 and interest thereon, for car rentals under contracts made between the railway company and the car company. It also claimed the sum of $1500 under the terms of these car contracts for the value of 2 box cars destroyed by the railway company and not replaced. It claimed that the furnishing of cars to the railway company under these contracts was in the nature of supplies furnished to it by means whereof the company had been enabled to transact its business, and prayed that the receiver might be ordered to pay his indebtedness to the petitioner out of any moneys in his hands or income received from the business of the railway company.

To this original petition were attached statements of account,

as exhibits, showing the amount claimed by the car company against the railway company prior to the appointment of the receiver, and also copies of two contracts between the car company and the railway company, one bearing date March 5, 1872, for the leasing of 70 box cars and 20 stock cars, the other bearing date October 1, 1873, for the leasing of 150 box cars.

To this original petition answers were filed by both the complainants in the original cause and the receiver. The answer of the complainants in the original cause charged that these contracts were fraudulent and void, for the reason that at the time when they were made Benjamin E. Smith was the owner of a large amount of the stock of the car company, and its president and in control of its operations, and Hamilton was the owner of a considerable portion of its stock, and the remainder of its stock was owned and controlled by the associates of Smith and Hamilton; that at the same time Smith was the vice-president of the railway company and the owner and holder of a great portion of its stock, and controlling its operations through the officers and agents whom he named and appointed, and Hamilton was the president of the railway company; and that Smith, Hamilton, and their associates owned and controlled the majority of its capital stock, and with their associates combined to defraud the owners and holders of the first mortgage bonds, and made these contracts for leasing cars for that purpose. The answer further charges that the rental reserved by these contracts was exorbitant, and that the fair rental for the cars in question did not exceed the sum of $10 per month per car, whereas the contracts reserved a rental of $20 per month per car; and that the car company received from the railway company moneys to the amount of more than $76,000.

The answer of the receiver stated that the books of the railway company showed credits to the car company for rental of cars to the amount of $115,686.70, and payments made to the car company prior to his appointment, amounting to $76,031.70, and that since his appointment he had paid over to the car company, under the order of court, $6237.01. It alleged that

the two cars were destroyed in the possession of the railway company more than six months prior to his appointment, and charged that the rental reserved by the contracts was extortionate, and that the cars were not worth to the railway company and could not be made worth more than from $7 to $10 per month per car. The receiver also stated that he had not as receiver used these cars under the said contracts, or in anywise adopted, recognized or confirmed the contracts.

Both answers, that of the complainants to the original bill and of the receiver, denied that the rental of the cars was in the nature of supplies or that the car company should have precedence or priority awarded to it over the bondholders.

On March 14, 1877, the car company filed its amended petition. In this it represented that when Hilliard was appointed receiver the railway company was in possession of 240 cars belonging to the car company under the two contracts. That on June 11, 1875, the former contracts were modified and changed by another contract made between it and the receiver, by which it rented to the receiver 138 of these cars, and that an additional clause was appended to that contract renting to the receiver 56 other cars. The amended petition set out *verbatim* this contract with the receiver and the additional clause appended to it, and charged that the receiver continued in possession and use of the 138 cars and the 56 cars, and claimed that there was due from the receiver to the car company for the rental of these cars $15,281.34, with interest.

It is also claimed that the rental due for the use of its cars by the receiver was in the nature of a current operating expense, and a lien on the road and its property superior to that of the mortgage, and prayed that in case the fund in the hands of the receiver should not be sufficient to pay these claims, the payment thereof might be enforced as a first lien on the road and property of the railway company, and paid out of the proceeds of any sale thereof.

To this amended petition were attached statements of rentals charged to be due to the car company from the receiver.

On May 26, 1877, an order was entered, directing the amendment to the petition of the car company, filed March

14, 1877, to be stricken out as an amendment to the petition theretofore filed, and ordering that it stand as a petition against the receiver, and giving the car company leave to file a supplemental petition.

This supplemental petition was filed May 26, 1877. It averred, as supplementary matter, that the receiver had notified the car company that he would not keep the 138 cars in service after May 1, and that he had returned 88 of said cars, and proposed returning the remaining 50; that the receiver had neglected to keep the cars in repair, as provided in the contract, and had returned them in bad order and out of repair; and that the car company had been obliged to put them in the shops for repairs, and had thereby sustained large damages.

That as to the 56 cars, and to the rental due on them, the receiver had notified the car company that he did not, and would not, recognize any liability to it for the use or rental of the 56 cars.

On the 27th of June, 1877, the receiver filed his answer to the amended petition of the car company, in which he stated that when he took possession as receiver of the property of the railway company only 135 of the 138 cars came into his possession. That during the months of February and March, 1875, he used the 135 cars and paid the car company $12 per month per car; that about April, 1875, he obtained leave from the court to rent these cars at a rate not to exceed $10 per month per car, and executed the agreement dated June 11, 1875, a copy of which is set out in the amended petition of the car company.

That in April, 1877, he became satisfied that the cars so rented could not be used to advantage at the rental of $10 per month, and notified the car company that he should return them on May 1, 1877, and that he did return them from time to time, as collected.

That when he received these cars into his possession as receiver they were in poor condition and out of repair, and he was obliged to and did make large and extensive repairs on them, and that he kept them and returned them in better re-

pair than when he received them, and that they were in good repair for use on said road.

As to the 56 cars the receiver stated that he did not receive these cars from the car company, and did not agree with the car company to pay it any rental for them, and never executed and delivered to the car company the alleged writing in reference to the same; that Mr. Ingersoll, who was his attorney and the attorney of the car company, brought a replevin suit in the United States Circuit Court for the Northern District of Illinois against the Chicago and Northwestern Railway Company, and under the replevin writ in that suit caused the 56 cars to be seized, he and one Whiting giving the bond necessary for the obtaining of the writ, and, in order that the bondsmen might have security to indemnify themselves upon their bond, they kept these cars in their possession and obtained leave from the receiver to store them on the side tracks held by him as receiver; that it was afterwards agreed between Ingersoll and the receiver that when the receiver should have occasion to use more cars than he then had as receiver he might use these 56 cars, paying the usual mileage rate of one cent per mile run, when the replevin suit should be determined, but that the cars should only be used for the local business of the receiver's road, and should not be allowed to run or go off from that road. The answer further stated that he had used the cars to some extent under his agreement, and was ready to account for such use when the replevin suit should be determined, and to surrender the cars at that time.

The answer further stated that in 1875 the general agent of the car company was in Peoria, and that Ingersoll and this general agent then expected the replevin suit to be decided before the December following, and this agent desired, if this was done, to make some arrangement for renting these 56 cars without being required to return them again to Peoria, and the copy of the contract of June 11, 1875, belonging to the receiver, being then in the possession of Ingersoll, as the receiver's attorney, Ingersoll endorsed upon it the additional clause or memorandum, a copy of which the car company had set out in its amended petition, and the receiver signed this as a memo-

randum, but it was never given to or delivered to the car company or any one for it, and never passed out of the control of the receiver, and that the receiver had, and claimed to have, no power or authority or intention to make any contract for the rental of the said cars, and instructed his attorney not to allow this memorandum to go out of his possession or to make any contract in relation thereto, even if the replevin suit should be decided, unless the court should first authorize the making of such contract as to the said 56 cars. And the receiver averred that the replevin suit had never been decided; that he had never had the full use of the cars; and denied that he owed any rental thereon; and stated that he had never applied for leave of court to make any contract for the rental of the 56 cars, because the circumstances under which such contract was to be made had never arisen.

On July 3, 1877, the complainants in the original cause filed an amended answer to the petition of the car company, in which the car company asserted and asked for payment of the balance due for rentals prior to the appointment of the receiver. This amended answer sets out more strongly the alleged fraudulent character of these car contracts between the car company and the railway company.

It shows the construction contract on June 1, 1870, made by the railway company with Benjamin E. Smith and his associates; that Smith was the president of the car company, and Dennison and others were associates of Smith in the construction contract and in the car partnership and company; that Smith and his associates received from the railway company 12,000 shares of its stock, which constituted a large majority of the entire stock, and also received all of the first mortgage bonds of the company; that they caused these bonds to be advertised for sale and procured their sale by means of false representations, representing, among other things, that the bonds were sold by the railway company for the purpose of placing the necessary equipment upon its road, and that complainants purchased their bonds relying upon these false representations; and they charged that in fact the bonds were not held by the railway company nor were the proceeds thereof

used in furnishing the equipment for its road, but were used for the private benefit of Smith and his associates.

This amended answer further shows that about January 1, 1872, Smith and his associates united themselves together in a partnership known as the Western Car Company, and that Hamilton, who was then the president of the railway company, and Charles W. Smith, who had been appointed by Benjamin E. Smith the general manager of the railway company, also became partners in this car partnership, and that the partnership furnished the cars to the railway company and made these contracts with it under these circumstances; that afterwards Smith and his associates and other partners in the Western Car Company organized themselves into a corporation under the laws of Delaware, but that this corporation was but a continuation of the partnership bearing the same name, and was controlled, governed and directed by Smith and his associates.

That during 1872 and until the 1st of February, 1875, Smith and his associates controlled and dictated all the contracts and business operations of the railway company; that Hamilton, its president, Benjamin E. Smith, its vice-president, and all of its directors were chosen and appointed by Smith and his associates; that the contracts made and dictated by them were fraudulent and void in equity; and that the amount agreed by these contracts to be paid as rental was grossly excessive.

They claimed further that the railway company had paid to the car company for the use of its cars more than their use was worth; and that the car company should be precluded from claiming any sum whatsoever as due for rental, and was estopped from claiming to own the cars.

On October 16, 1877, which was after the time fixed by the court for closing proofs in all intervening claims, the car company filed a further amendment to each of its intervening petitions. Its original petition it amended by praying that whatsoever sum should be found due to it might be paid out of the proceeds of the sale of the road. It also alleged that the reasonable rental for all the cars named in each of its peti-

tions, irrespective of any contract price, was, up to the end of July, 1874, $20 per month per car, and from that time to the appointment of the receiver $15 per month per car, and from that time on at least such amount as is named in the contract between it and the receiver.

Its petition against the receiver it amended by charging that at the time of the appointment of the receiver and of his entry into the possession of the railway, he took possession of 100 cars which had been rented by it to the railway company, and which were known as White Line cars; that the receiver held these cars for some months and returned them some time in March or April, 1875, in bad condition and out of repair; and that the petitioner upon receiving them was obliged to expend moneys in their repair.

It also charged, as to the 56 cars, that the replevin suit concerning them had been decided by the court in favor of the car company; that since the receiver was appointed he had held and claimed the right to hold these cars, pending the replevin suit, and refused to pay rent for them; and it claimed rental due for their use, amounting to $13,000. It also claimed that these 56 cars were badly out of repair, and so damaged for want of ordinary necessary repairs that it would cost the car company $9500 to put them in good repair.

Afterwards, and on October 31, 1877, it filed a petition praying for an order directing the receiver to return the 56 cars, and on this petition the receiver was ordered to surrender and deliver these cars to the car company.

On these issues a large quantity of evidence was offered before the master by both parties.

The respondents claimed that the only amounts that were in equity due to the petitioner, and should be allowed to it from the fund in court, were the balance of rentals due from the receiver on the 134 cars, $8789.86 ; the mileage earned by the 56 cars, $3496.78; and the value of one car lost and not returned by the receiver, $450 ; making a total of $12,736.64.

The master's report in this intervening cause, filed June 22, 1885, found, as to the amount claimed as due from the railway company prior to the receivership, that the question as to

whether the contracts were fraudulent and void was "unim-- portant," in view of "the practice of the court in cases of this character to allow against the fund or the receiver claims of this kind established by the testimony as reasonable and just, which have accrued during the period of six months prior to the appointment of the receiver, and during the receivership, independent of any contracts which may have previously existed, unless such contracts have been recognized and adopted by the court"; and that for the period of six months prior to the receivership there was due the car company a balance of $2062.99. The master disallowed claims as to lost cars and repairs on White Line cars.

As to the claims against the receiver, the master found the car company entitled to the balance remaining unpaid of the rental of the 135 cars, at the rate which the receiver had agreed to pay, amounting to $8807.97. He also found under protest the car company entitled to the sum of $14,046.55 paid out for repairing these cars after their return by the receiver. As to this allowance for repairs, the report says: "I have found it difficult to deal with this branch of the case for the reason that while it appears that the bills which have been presented for these repairs were actually paid by the petitioner, it is also evident in many instances these repairs were extravagantly conducted, and that in many respects they were rendered necessary by their condition before they came into the hands of the receiver, and there is much testimony in the case showing this to have been the fact. It is also apparent from the testimony that in many cases cars were practically rebuilt and renewed. Upon a very careful examination of all the testimony bearing on this branch of the petitioner's claim, I find it impossible to separate items of this account in such a way as to equitably charge this respondent with such portion of the repairs as he should be called upon to pay upon the basis of the claim of the petitioner, although in my estimation the effect of the testimony is to show that a credit at least to some extent of the amount charged by the petitioner upon this item should be applied to the reduction of this claim."

The master allowed the petitioner mileage on the 56 cars up to December 1, 1875, and a rental of $10 per car per month from then until they were surrendered, although, as he says, "perhaps it (a contract as to these cars) was not finally consummated or delivered." He also allowed $5650, the full amount claimed as expended in repairing these latter cars, though he finds that they came into the receiver's possession in bad condition, for the same reason which he had given as to the claim for repairs to the 138 cars, that he was unable to make an equitable distribution of this. The master disallowed all claims for interest, and found the total amount of $43,816.69 due to the car company.

To this report exceptions were taken by the car company, the complainants in the original bill, and the receiver, which were argued before Mr. Justice Harlan in June, 1887, and on August 29, 1888, his opinion in this intervening cause was filed. 36 Fed. Rep. 808.

In this opinion the contracts between the car company and the railway company are held to be fraudulent and void as to the railway company. But the court holds that nevertheless the car company is entitled to be reasonably compensated for the use of its cars, without reference, however, to the contracts.

As to what would be a reasonable compensation, the court holds that "a fair compensation for the use of these . . . would be such amount as similar cars to be used in the same manner and upon similar roads would commonly rent for in the open market."

The court then states the general principles which have been established by the decisions of this court as to charging the income of the receivership with the payment of certain classes of liabilities of the railroad company incurred prior to the receivership, and their payment from the proceeds of the sale of the railroad prior to the mortgage indebtedness. It holds that the six months rule, which is the general rule in the Seventh Circuit, should govern, and finds the car company entitled to $8162.99, as the balance due to it for the use of the cars during the six months prior to the receivership, thus in-

creasing by $6100 the allowance made by the master on this branch of the case.

As to the claims against the receivership, the court found that the receiver was chargeable with the rental of 138 cars, instead of 135, as found by the master, amounting to $9667, and with the $14,046.55 paid by the car company for repairs on these cars. The court also allowed the car company the rentals claimed for the 56 replevied cars, $12,857.32, though, as the opinion states, "with great difficulty." It also allowed the $5650.32 claimed for repairs of the replevied cars. The total amount found due to the car company was $50,775.52, and interest at six per cent was allowed on this sum from June 22, 1885, the date of the filing of the master's report.

On October 9, 1888, the final decree was entered, from which the complainants in the original foreclosure suit prayed and were allowed an appeal.

After the entry of the decree, Ransom R. Cable filed a petition, praying that the decree might be opened, and that he might be made a party defendant thereto and to the intervening cause, for the purpose of prosecuting an appeal therefrom, or be allowed to prosecute an appeal from said decree in the names of the complainants in the original cause. This petition represented that a decree directing the sale of the railroad property and franchises was rendered January 11, 1877, and that at this sale under this decree the petitioner had become the purchaser, and the sale to him had been confirmed, and he had been ordered to pay into court on his bid all of the first mortgage bonds held by him, and had deposited under this order 1395 of the entire 1500 first mortgage bonds of said company. On December 1, 1888, it was ordered that leave be granted Cable to prosecute the appeal in the name of the complainants to the original cause, and that this appeal should become a supersedeas on his filing an appeal bond in the sum of $80,000. The bond was therefore filed, and thereafter the record on this appeal was brought to this court.

*Mr. Charles M. Osborn* and *Mr. Samuel A. Lynde* for appellants.

*Mr. H. B. Hopkins* and *Mr. John M. Butler* for appellee.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

The questions presented by this record for our determination arise out of objections by the appellants to allowances made by the court below in favor of the Western Car Company, the appellee, and which company was permitted to intervene in the foreclosure proceedings brought by the appellants against the Peoria and Rock Island Railway Company.

The first contested question is as to the propriety of the allowance of the sum of $8162.99 for the use of cars of the Western Car Company for a period of six months prior to the receivership.

It cannot be said that in no case can indebtedness for necessary supplies, which accrued before the appointment of a receiver, be allowed priority to the mortgage bonds. It was held in *Miltenberger* v. *Logansport Railway*, 106 U. S. 286, 311, that "many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property, for the receiver to pay preëxisting debts of certain classes, out of the earnings of the receivership, or even the *corpus* of the property." It is, however, added that "the discretion to do so should be exercised with very great care. The payment of such debts stands, *prima facie*, on a different basis from the payment of claims arising under the receivership, while it may be brought within the principle of the latter by special circumstances. It is easy to see that the payment of unpaid debts for operating expenses, accrued within ninety days, due by a railroad company suddenly deprived of the control of its property, due to operatives in its employ, whose cessation from work simultaneously is to be deprecated, in the interests both of the property and of the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs, and for unpaid ticket and freight balances, the outcome of indispensable business relations, when a stoppage of the continuance of such

business relations would be a probable result, in case of non-payment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense, by maintaining the good will and integrity of the enterprise, and entitle them to be made a first lien."

This subject received further consideration by this court in the case of *Kneeland* v. *American Loan Company*, 136 U. S. 89, 97, and where it was said : "The appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company, or to work for it, and whoever has dealings with a company when property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception and not the rule that such priority of liens can be displaced." And, accord-

ingly, all claims for rental of cars prior to the appointment of the receiver were disallowed.

Tested by the principles asserted in these cases, the claim for car rental that had accrued prior to the receivership cannot be maintained, but should have been disallowed.

The case of a corporation for the manufacture and sale of cars, dealing with a railroad company, whose road is subject to a mortgage securing outstanding bonds, is very different from that of workmen and employés, or of those who furnish, from day to day, supplies necessary for the maintenance of the railroad. Such a company must be regarded as contracting upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity.

In the present case it appears, in the contract between the car company and the railroad company, that the former reserved the express right to terminate the contract and demand possession of the cars forthwith upon any failure by the railroad company to promptly pay the interest or the principal of any of its bonds or other liabilities. Such a provision shows that the car company was aware of the existence of the outstanding bonds, and protected itself by other methods than relying upon the possible order of a court which might appoint a receiver. Moreover, it appears in this case that the principal officers of the car company were in control of the railroad company and its operations, and must be treated as having full notice of the financial condition of the railroad company, and as having leased the cars to it in reliance upon its general credit, rather than in expectation of displacing the priority of the mortgage liens.

The item of $9667, allowed for a balance of rental of cars that accrued during the receivership from February 1, 1875, to the surrender of the cars, appears to us to come fairly within the doctrine of this court as a proper allowance.

The next contested claim is for $12,857.32, allowed by the court below for rental of the 56 cars which had been replevied by the Western Car Company from the Chicago and Northwestern Railroad Company, and placed in the control of the receiver of the Peoria and Rock Island Railway Company.

It is contended by the appellants that these cars were not necessary for the use of the receiver, and were put in his custody as a matter of convenience for the car company, and that, at any rate, the amount charged for their use, and allowed by the court below, was excessive.  They claim that a mileage charge for the actual use of the cars would be an equitable allowance.  The evidence upon this branch of the case is conflicting and confusing.  The learned judge of the court below, in his opinion, says: "Looking at all the circumstances, I am of opinion that the endorsement by the receiver on the agreement of June 11, 1875, signed by him, that the 56 cars delivered to him, 'being the cars replevied from the Chicago and Northwestern Railroad Company,' shall be retained by him 'upon the same terms set forth' in the above agreement, 'commencing on the first day of December, 1875,' should turn the scale, and as the terms of the agreement of June 11, 1875, were not unreasonable, and as the endorsement was one which the receiver might reasonably have made in the interest of a fair administration of the property in his hands, I approve the finding of $12,857.32 as the rental of the replevied cars while they were under the control of the receiver."

Our conclusion, reached with some difficulty, and after a careful consideration of the evidence, is to accept the views of the court below, and to allow this claim.

The next matters of contention are the allowances made by the court below on account of repairs of the rented cars, being $14,046.55 for repairs on the 138 cars rented under the agreement of June 11, 1875, and $5650.32 for repairs on the 56 replevied cars.

It should be observed that the sums so allowed were not for repairs made by the receiver, but for moneys expended by the car company in rebuilding and repairing the cars after they were surrendered to the car company by the receiver.  By the contract between the receiver and the car company it was provided that the former should keep the cars in good repair for use on the road.  Hilliard, the receiver, testified that the condition of the cars, when he was appointed, was very poor, and in this he was corroborated by other witnesses.  He also

states that when they were delivered up to the car company they were in as good condition as, and better than, when he received them. Mozier and Doyle, who were familiar with their condition when the receiver took possession of them, and who had made repairs on them while the receiver used them, testified that the condition of the cars was better when delivered up than when they came into the hands of the receiver.

There is, however, testimony on behalf of the car company to the contrary. Our consideration of the conflicting evidence brings us to the conclusion that the car company is entitled to an allowance on account of repairs, but not to the amount awarded by the court below. The master reported on this subject as follows : " I have found it difficult to deal with this branch of the case, for the reason that while it appears that the bills which have been presented for these repairs were actually paid by the petitioner, it is also evident that in many instances these repairs were extravagantly conducted, and that in many respects they were rendered necessary by their condition before they came into the hands of the receiver. It is also apparent from the testimony that in many cases cars were practically rebuilt and renewed." And in respect to the 56 replevied cars he says : " It is apparent from the testimony that these cars were received in bad condition, after having been used for two or three years by the railroad, from which they appear to have been taken by the receiver, partly, at least, upon the suggestion and for the accommodation of the petitioner."

He further reported that he found it impossible from the testimony to determine to what extent the respondent was liable for the payment of this charge, and that he was unable to make what might finally be regarded as an equitable distribution of this liability, and was, therefore, obliged to charge the respondent with the full amount of the payments shown to have been made on this account. If, indeed, it was impossible, under the evidence, for the master to discriminate between what was expended to put the cars into running order for use, as stipulated for in the contract, and the amount

expended in rebuilding the cars, it may be that the proper conclusion would have been to disallow the claims altogether. However, we are not disposed either to allow the claims for repairs in full, or to refuse wholly to regard them. We agree with the court below in thinking that the contract bound the receiver to keep the cars in good running order, and if he did not do so, to be charged with what was reasonably expended by the car company on that behalf after they were surrendered. Our examination of the evidence leads us to the conclusion that some allowance is properly chargeable against the receivership on this account.

In fixing the amount of such an allowance we do not find ourselves wholly left to conjecture. Theodore Mozier, the master mechanic of the Peoria and Rock Island Railroad Company, certified that he made an inspection of 138 of these cars at the time they were surrendered to the car company by the receiver, and he estimated that the sum of $994.20 would suffice to put them in fair running order. James Doyle, who was for some years in the employ of the Peoria and Rock Island Railway Company, and afterwards in that of the receiver, in the car shops, assisted Mozier in inspecting these cars. He states that, in his opinion, the cars were in poor condition when they came into the hands of the receiver and were in better condition when surrendered by him. He gave a detailed statement of repairs put upon these cars while in possession of the receiver, amounting to $1440. The testimony on the part of the car company consists chiefly of evidence of the amounts actually paid for repairs and reconstruction of the cars after they were surrendered. But it fails — indeed, does not pretend to try — to show how much of such payments was due to the original condition of the cars and how much to the wear and tear while in the hands of the receiver.

It is affirmatively found by the master that, in many instances, the repairs were extravagantly conducted; that in many cases the cars were practically rebuilt and renewed; and that in many respects the repairs were rendered necessary by their condition before they came into the hands of the receiver.

We think it is clear that the object and scope of the repairs put upon the cars was not merely to put them in running order, but to renew them, so as to put them in a condition acceptable to a new lessee. The expenditure for such repairs is shown to have been about $100 per car; and it was testified by General Huidekoper, a witness on behalf of the car company, and a person of large experience in such matters, that the cost of a general overhauling and rebuilding of cars is from $50 to $80; and that $36 a year for ordinary repairs and $80 every two years for general repairs would keep the cars in good order.

Assuming, then, that the proportion of the amount shown to have been expended in the renewal of these cars was $80 per car, and the rest in ordinary repairs of the kind contemplated by the contract, and deducting from the claims as made for the entire number of the cars, to wit, $19,695, the estimated cost of reconstruction, as certified to by Huidekoper, $13,920, there remains the sum of $5775, representing ordinary repairs, and to that extent we approve the decree of the court below in allowing for repairs.

The final matter of contention is the allowance of interest. We think the court below was plainly right in rejecting the car company's claim for interest based upon the statute of Illinois, prescribing interest at the rate of six per cent per annum for moneys after they become due on " any bond, bill, promissory note or other instrument of writing." But the learned judge was of opinion that some allowance of interest should be made, because of what he deems to have been a vexatious and unreasonable delay in the payment of what was justly due the car company. As against this view of the case it is urged that the delay was occasioned by resisting demands made by the car company, which the result of the litigation shows were excessive, if not extortionate.

We cannot agree that a penalty in the name of interest should be inflicted upon the owners of the mortgage lien for resisting claims which we have disallowed. As a general rule, after property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on

the claims against the funds. The delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate. *Williams* v. *American Bank*, 4 Met. 317, 323; *Thomas* v. *Minot*, 10 Gray, 263. We see no reason in departing from this rule in a case like the present, where such a claim would be paid out of moneys that fall far short of paying the mortgage debt.

We, therefore, reverse the decree of the court below in the particulars hereinbefore mentioned, and remand the record with directions to modify the decree in accordance with this opinion.

*Reversed.*