**In re WISCONSIN CENT. RY. CO.**

No. 17104.

District Court, D. Minnesota,
Fourth Division.

Jan. 18, 1946.

George W. Morgan, of St. Paul, Minn., and M'Cready Sykes, of New York City (Morgan, Chase, Headley & Hoshour, of St. Paul, Minn., and Stewart & Shearer, of New York City, of counsel), for Trustees under First General Mortgage.

W. Lloyd Kitchel, of New York City (Cadwalader, Wickersham & Taft, of New York City, of counsel), for Protective Committee for First General Mortgage bonds.

Olin, Clark & Murphy, of New York City, and Stinchfield, Mackall, Crounse & Moore, of Minneapolis, Minn. (Thomas P. Helmey, of Minneapolis, Minn., of counsel), for Empire Trust Co. and Henry A. Bultman, Trustees of Refunding Mortgage.

Henry S. Mitchell, of Minneapolis, Minn. (Leonard H. Murray, of Minneapolis, Minn., of counsel), for Canadian Pac. Ry. Co.

Snyder, Gale, Hoke, Richards & Janes, of Minneapolis, Minn., and Cravath, Swaine & Moore, of New York City, for Chemical Bank & Trust Co. and John A. W. Richardson, Jr., as Trustees under Superior and Duluth Division and Terminal First Mortgage.

See, also, 63 F.Supp. 151.

James L. Hetland and E. E. Boyner, both of Minneapolis, Minn., for Minneapolis, St. Paul & Sault Ste. Marie R. Co.

James E. Dorsey and Donald West, and Dorsey, Colman, Barker, Scott & Barber, all of Minneapolis, Minn., for Trustees of Debtor Co.

J. B. Faegre and Everett A. Drake, both of Minneapolis, Minn. (Faegre & Benson, of Minneapolis, Minn., of counsel), for Trustee under Marshfield and South Eastern Division Mortgage.

NORDBYE, District Judge.

All the parties who have filed briefs and participated in the oral argument recognize that the Trustees of the debtor have the right to use the income to operate the debtor railroad and that their claims are subsequent to that right. Consequently, question (b) becomes moot at this time and need not be discussed. The determination of the question propounded under (a) requires an understanding of a rather detailed recital of facts.

The debtor was placed in receivership on December 3, 1932, by virtue of a complaint filed by the Northwestern Fire & Marine Insurance Company, which alleged that it owned $5,000, principal amount, of the debtor's First General Mortgage bonds and $5,000, principal amount, of the debtor's Superior and Duluth Division and Terminal First Mortgage bonds. After stating reasons for the need of a receivership, the petitioners prayed that a receiver be appointed "of all of the railroad's rolling stock, rights of property and franchises of every kind and description, wherever located belonging to the defendant, together with the rents, issues, profits, revenues and income thereof, with full power and authority to take possession of all of the foregoing property, to operate, or make appropriate arrangements for the operation of the same, * * * and to collect and receive * * * the revenues thereof so that they may be applied and administered as may be ordered and decreed by this Court * * *."

The debtor answered and joined in the prayer for a receiver's appointment. The Court's order of December 3, 1932, approving the receiver authorized him, among other things, to collect the income accruing on and after December 3, 1932. The First General Mortgage Trustees (hereinafter called the First General Trustees) and the Superior and Duluth Division and Terminal First Mortgage Trustees (hereinafter called the S. and D. Trustees) filed intervening petitions, and on December 28, 1932, they were made parties plaintiff by an appropriate order. In their intervening petitions, the Mortgage Trustees set forth that, by the terms of their respective mortgages, "all the tenements, hereditaments and appurtenances of the mortgaged property * * * and all the rents, issues, profits, tolls and other incomes of such property, whether then owned or thereafter acquired, were subjected to the mortgage." And, further, each petitioner averred that the plaintiff, a bondholder of bonds in each issue is not entitled "to institute any suit, action, or proceeding in equity or at law for the foreclosure of the mortgage or for the execution of any trust thereof, or for the appointment of a receiver, or for any other remedy thereunder unless such bondholder shall previously give to the Trustees written notice of the defendant railway company's default and the continuance thereof, and unless also the holder of twenty-five per cent in amounts of the bonds outstanding shall have made written request upon the Trustees and shall have afforded them reasonable opportunity to institute such action, suit or proceeding in their own names." The petition then pointed out that no notice or any request of any kind in compliance with the terms of the mortgage had been given to the Trustees prior to the beginning of the suit, and then stated that the action of the plaintiff in beginning such action and all proceedings therein taken by it and by the Court up to the present time "have in fact been in behalf of all the bondholders, whose only right or cause of action is vested in your petitioners as Trustees, and your petitioners ask for leave to apply to be substituted as plaintiffs herein in the place and stead of Northwestern Fire and Marine Insurance Company." Although the Mortgage Trustees were not substituted in the place and stead of the plaintiff company as plaintiffs, they did, from the time of their intervention, actively participate in all matters pertaining to the administration of the estate by the Court and aided and assisted the receiver and the Court in the administration of such estate. A formal petition, however, requesting that the debtor's income be impounded in accordance with the terms of the respective mortgages was not filed by the Mortgage Trustees until on or about November 11,

1937. At that time a formal petition requesting the impounding of debtor's income was filed by the Trustees of the First General Mortgage, the S. and D. Mortgage, and the Marshfield and South Eastern Purchase Money First Mortgage and Supplement Mortgage thereto. The Trustees of the latter mortgage, however, did not intervene until November 8, 1937. It appears from the record herein that counsel for the Trustees of these three mortgages as early as February, 1933, requested that accounts be set up from the beginning of the receivership showing the revenues and disbursements allocable to the three mortgage divisions according to some proper formula, and counsel was informed by the receiver and his counsel that such accounts would be set up. The impounding petition of November 11, 1937, alleged that the petitioning trustees and the holders of the bonds secured by the three mortgages possessed the right to all the income earned by their respective mortgage districts under the, receivership. When this petition was presented, the Court did not assume to pass on the date when the impounding of income became effective, but merely entered an order that the petitioning Mortgage Trustees were entitled to the income accruing not later than November 11, 1937.

The question now before the Court is whether the rights of the bondholders to the income arose with the beginning of the receivership or with the filing of the demand for the impounding of income. In that there were no earnings between the date of the receivership and December 28, 1932, when the First General Trustees and the S. and D. Trustees were made parties, any distinction between these two dates becomes immaterial. Consequently, the First General Trustees do not press any claim to impounding income prior to the date of intervention. All parties, of course, recognize that the right arose not later than the date of the impounding beginning on November 11, 1937. The First General Trustees and the Protective Committee for holders of First General Mortgage bonds contend that their right to the income arose with their intervention because the petition in the receivership proceeding was by one of the First General bondholders and was brought specifically for the benefit of all bondholders and all the creditors. The Minneapolis, St. Paul and Sault Ste. Marie Railroad (hereinafter called the Soo Line) and the Trustees of the S. and D. Mortgage, although the latter once contended that the income became impounded as of the date of the receivership proceeding, contend that under the law the bondholders did not become entitled to the income from their respective mortgage districts until the demand for the impounding was made. The Soo Line claims to be a general creditor and hence is interested in the question of free funds. The S. and D. Trustees presumably are looking to free funds for the satisfaction or partial satisfaction of their claim to the extent that the same is not satisfied out of the security, rather than from any rights which may inure to their mortgage estate by the impounding provisions. In that the provisions of the First General Mortgage and the S. and D. Mortgage are substantially the same with reference to the lien on rents, profits, income, etc., reference will only be made to the specific material provisions of the First General Mortgage and the provisions of the Marshfield and South Eastern Mortgage in discussing the question.

Granting Clause Eleventh of the First General Mortgage provides that "all rents, profits, tolls and other incomes of all property which shall from time to time be subject to" the indenture are granted to the Trustees. Article Four, Section 17, provides that if a receiver of the railway is appointed "in any judicial proceedings by any party other than the Trustees," the Trustees "shall thereupon be entitled forthwith to exercise the right of entry herein conferred and provided to be exercised by the Trustees upon the occurrence and continuance of default, as hereinbefore provided * * *." Article Four, Section 16, provides that "if, in event of default by the Railway Company * * * a bill in equity shall be filed or any other judicial proceeding commenced to enforce any right of the Trustees, or of the bondholders under this indenture, then the Trustees shall be entitled to exercise the right of entry herein conferred and * * * as a matter of right, the Trustees shall be entitled to the appointment of a receiver of the property hereby mortgaged and of the earnings, income, revenue, rents, issues, or profits thereof."

The mortgage provisions of the First General Mortgage show that the mortgage grants to the Trustees no automatic or self-executing rights to the debtor's income

when the latter defaults on any interest payments or when a receiver is appointed in an action by a third party. It would appear that the occurrence of such circumstances only, causes the Trustees to be "entitled" to enter the property and receive the income through the receiver. The mortgage contemplates something else before the Trustees are entitled to. the income itself. The mortgage is silent upon the steps to be taken in order to enforce the lien rights. Therefore, we must look to the rules and principles governing the procedure which has been taken herein in equity.

The Mortgage Trustees recognize that the bondholder who started the action acted as a creditor and that the action he commenced was like a creditor's action. They recognize that the proceeding therefore must be classed as a creditor's action if it is premised, as it is, upon the petition of the Northwestern Fire & Marine Insurance Company. But it was a creditor's action in behalf of all other creditors, secured and unsecured, and the receiver took possession of the property in order to administer the estate for the benefit of all. The question, therefore, arises, Was the demend in the form of a petition to the Court for impounding of the income necessary, and if so, does the date of the impounding commence as of the date of such demand or the date of intervention? Or do the type of receivership and the other facts and acts present herein fairly show that the Mortgage Trustees took sufficient steps to justify their present claim to the income prior to the impounding demand of November, 1937?

In determining this question, a conflict of laws problem is present, for the contracts were made and are performable in New York and the property of the debtor is located in Wisconsin, Illinois, Michigan, and Minnesota. The Soo Line and the S. and D. Trustees contend that the law of the forum—Minnesota—must govern because the question here concerns a remedy. The First General Mortgage Trustees and the Protective Committee for the First General Mortgage bondholders contend, however, that the problem before the Court involves the validity and enforcement of the pledge of part of the mortgaged property, and that such a problem concerns a right which is governed by the law of the place where the property producing the income is located (lex loci sitae). But

all parties recognize, however, that this conflict of laws question does not affect the main issue noted if all the states in which the debtor's property is located follow the same rules with respect to that main question. Consequently, the Minnesota, Wisconsin, Illinois, and Michigan cases dealing with the main issue should be considered.

In Minnesota, the law is enunciated by Seibert v. Minneapolis & St. Louis Ry. Co., 1893, 52 Minn. 246, 53 N.W. 1151, 1152, which is the leading case. The parties herein are at issue as to what this case holds. But a fair and close analysis of the case seems to support the position taken by the First General bondholders. Briefly, the facts, as shown by the published opinion, and the paper book containing the record before the Court, are as follows: A part of the railway line of the Minneapolis & St. Louis Railway solely situated in Minnesota was incumbered by a mortgage of which plaintiff was trustee. Eight other mortgages were prior to ,plaintiff's. On June 28, 1888, the plaintiff filed his original bill to foreclose his mortgage and requesting that a receiver be appointed for "said railway and its appurtenant property for the benefit of all parties interested therein." The eight senior mortgagees were made defendants, and in effect the bill asks for a "foreclosure of all the mortgages and an adjudication as to the order of priorities." A receiver was appointed with the usual powers. The first default in interest on the senior bonds occurred on October 1, 1888. On November 17, 1888, a group of senior mortgage bondholders, hereinafter called the "Benson Group", filed a petition alleging that the receiver had not yet segregated the earnings of the railway for their mortgage district from the railway's earnings from other mortgage districts. On the same day, the receiver was ordered to segregate the funds so as to show the earnings and the expenses of the senior mortgage district from the time the receiver took possession and to hold the surplus separate. The Benson Group then petitioned to have the surplus paid on their bonds as interest. This was granted. When the interest was paid on the bonds, the plaintiff filed an "amendment and supplement" to his complaint. He sought thereby to have the receivership for his sole benefit. On October 31, 1891, some three years after the receiver was appointed, the trustee of the Benson Group's bonds filed an answer

to the new complaint and asked that the receiver be adjudged to be holding the earnings for and on behalf of this senior mortgagee and bondholders. When interest was paid on these senior bonds out of money accruing since the receivership commenced, and prior to the date of the trustee's demand for the impounding, plaintiff appealed. The lower court held that the bondholders were entitled to such funds from the date the receivership commenced. In other words, the bondholders were held entitled to such funds which were earned prior to the trustee's formal demand therefor. This is the decision which the Supreme Court affirmed. The fact that the Benson Group made a demand on November 17, 1888, some months after the receiver was appointed, does not seem to have been controlling; that is, the Supreme Court did not base the trustee's right to the net earnings from the commencement of the receivership upon the demand of that group of bondholders. On the contrary, it said that the rights of the Benson Group "are the same, in so far as this appeal is concerned, as those of the trustee in the mortgage securing their bonds. If he, had they remained out, would have been entitled to receive the money for the payment of interest coupons on the bonds held by them, they were so entitled."

At page 255 of 52 Minn., at page 1154 of 53 N.W., the court justified its decision in favor of the trustee upon the premise that "the purpose of this action is, in part at least, to adjust the rights of all the parties, as well to the income as to the body of the property. For the purpose of adjusting their rights to the income, it was necessary for the court to lay hold upon, not merely that portion which the plaintiff might be entitled to, but that which all the parties were entitled to. The order appointing the receiver not assuming to appropriate it to plaintiff, the court was to be regarded as taking and holding it for all the parties, as their rights and interests might appear, at least so long as none of them made objection."

It follows, therefore, that the Seibert case holds that one who is a party to a foreclosure proceeding brought for the benefit of all mortgagees and creditors is entitled, in accordance with its priority, to the net income earned on its mortgage district from the time the receivership commences. Two questions remain, however, with respect to the issues discussed in the

Seibert case: Does the fact that the instant proceedings are not foreclosure proceedings distinguish this case from the Seibert decision, and are the Mortgage Trustees herein in such a position in the receivership that they can be termed parties to the proceedings? The fact that the instant case is an equity receivership instead of a foreclosure proceeding does not seem to distinguish the Seibert case from the instant one. Here, like there, the mortgagee who is seeking the income was not the one who commenced the action. The action in the Seibert case was commenced by another mortgagee and no evidence of an immediate demand by the mortgagee appears in this proceeding or in the Seibert case. Both proceedings are in equity, and the decision in the Seibert case is based upon the receivership proceedings and the trustee's rights thereunder in view of his mortgage, not upon the fact of foreclosure by the one seeking the income. Moreover, the First General bondholders appear to be sufficient parties herein to prevent any valid distinction from the Seibert case on that basis. Within several weeks after the receiver was appointed, the First General Trustees petitioned for permission to intervene and they were granted that right several weeks after the original petition was filed, and from that time they have participated actively in the proceedings.

The Soo Line contends that the gist of the Seibert decision is (1) that a junior mortgagee cannot force the senior mortgage trustees to foreclose; (2) that the foreclosure of a mortgage is not necessary to make effective the pledge of income; and (3) that all the mortgagee need do is to demand the income by proper application to the receivership court. The first and second holdings contended for seem correct. The third one, however, may be "obiter dictum", for it refers to a problem which might arise in a receivership which was solely for the benefit of the party who petitioned for the receivership. That factor was not present in the Seibert case in the sense that the decision turned upon it; nor is it present in the instant case. Moreover, it is highly significant that, according to the holding in the Seibert case, the right of the trustee to the income was not limited to the income earned after his demand for its impounding. The court also affirmed his right against the income earned prior to his demand. So, even if a formal

demand is necessary under the principles enunciated in the Seibert decision, the income earned prior to such demand, in addition to that earned subsequently, is impounded. The demand in the Seibert case by the trustee of the senior mortgage was made some years after the receiver was appointed, and the delay in the demand did not deprive the trustee of its mortgage lien on the income prior to the demand. Where a receivership is instituted by a creditor for the benefit of all creditors, secured and unsecured, and a secured creditor having a lien on earnings intervenes and becomes a party thereto in recognition of the very objects for which the receivership was instituted, to wit, the marshalling and administering of the assets of the debtor according to the rights and priorities of the creditors, no sound or cogent reason is suggested, in absence of prejudice to other creditors by reason of delay, why the date of demand by such creditor for the impounding of funds fixes the date of the attachment of its lien thereto. In the instant equity reorganization, no prejudice is asserted by any creditor by reason of the delay in filing a formal demand for the impounding of income. All parties necessarily understood that the Court took possession of the properties of this railroad at the inception of the receivership in order to protect the rights and equities of all creditors according to their priority. It does not appear that the receiver or any creditor has taken any action, or failed to take any action, in connection with the administration of the estate by reason of any delay of the Mortgage Trustees in formally requesting the impounding of funds. During the entire receivership, the receiver has collected and retained the income and profits and has only disbursed such sums pursuant to general and special orders of this Court. The Court deferred the determination of the mortgage liens and the date of impounding until such questions became imminent by reason of the reorganization of the railroad. Certainly, the Mortgage Trustees herein have done nothing to estop their claim to an impounding lien from the date of their intervention, nor has anything occurred which could charge them with a waiver of such rights. Indeed, the determination of the lien and the date of the impounding of income to which the Mortgage Trustees are entitled can be determined as effectively, as fairly, and as equitably as if a written demand was made by the Trustees for impounding when intervention was permitted. To deprive the mortgage estates of the liens covenanted in the mortgages from the date of intervention would be unjustly enriching the unsecured creditors on principles which are neither sound nor just in law or in equity.

In view of these premises, therefore, the Minnesota law appears to sustain the position urged by the First General Mortgage Trustees and the Bondholders' Committee, and the law of Wisconsin and Illinois in this regard seems to be in full accord. In Wisconsin, the law has been established in Marshfield Oil Co. v. Zank, 1932, 208 Wis. 139, 242 N.W. 479. There, the third mortgagee obtained the appointment of a receiver after the first mortgagee had instituted foreclosure proceedings. The receivership was for the benefit of all creditors. After the sale of the property, the lower court ordered that the money which the receiver had obtained as a result of operating the property and which he held subject to the order of the court should be paid to the third mortgagee. The first mortgagee appealed, claiming he was entitled to the money because the property sold for less than the amount of his mortgage. The court held that the first mortgagee was entitled to the money because the receivership was for the benefit of all, and therefore the funds held by the receiver were applicable to the liens in order of their priorities. Although a foreclosure was involved here also, nothing seems to indicate that the court's decision was based upon the premise that the first mortgagee had commenced a foreclosure action. The decision seems based upon the theory that the receivership was the controlling factor. For that is what the court considered. The court did not mention any need for a demand or that the foreclosure might be its equivalent.

In Illinois, Cross v. Will County Nat. Bank, 1898, 177 Ill. 33, 52 N.E. 322, is the leading case. There, a junior mortgagee obtained the appointment of a receiver for the benefit of all creditors. The court held that in such a receivership the rents and profits must be distributed according to the priority of the liens. No mention was made of any demand. The rule of that case has been applied in nonforeclosure cases. In re Wakey, 7 Cir., 1931, 50 F.2d 869, 75 A.L.R. 1521.

In Michigan, the law is not clear. But in view of the Minnesota conflict of

laws principle that the rule of another state is presumed to be the same as that of the forum, unless the contrary is shown —Cooper v. Reaney, 4 Minn. 528, 4 Gil. 413—the Michigan rule would be held to be the same as Minnesota's, and therefore would permit the First General bondholders under the circumstances herein to obtain the net income of their mortgage district as petitioned herein.

■ The Court concludes, therefore, that the First General Mortgage bondholders are entitled to the income from their mortgage district from the time of their intervention and in accordance with their priority. This conclusion under the decisions referred to seems sound regardless of whether the right is considered a remedy or a substantive right. In view of the fact that the S. and D. Trustees have not waived their claims to the income from their mortgage district from the time of their intervention, although they have assumed that the law would not sustain that position and have submitted a brief asserting such a construction of the law, it would seem that they are nevertheless entitled to an order granting them the income from their mortgage district from the time of their intervention in accordance with their priority.

■ The provisions of the Marshfield mortgage must be differentiated from the other two mortgages. Section 8 of the Marshfield mortgage provides: "The Railway Company will first pay from the income of the mortgaged property, after paying the operating expenses thereof, and the taxes thereon, the interest accruing upon the bonds issued hereunder; and such net income shall, either before or after default, and whether said property is operated by the Railway Company, or by the Trustee under the power of entry hereinbefore reserved, or by a receiver appointed by any court at the instance either of the Railway Company or of any creditor, stockholder, or other person interested in said Company or having the right to apply for such appointment, be primarily pledged and applied to the payment of the interest and principal of said bonds according to the respective rights of priorities of such interest and principal as herein declared."

In view of this section, it would seem that these bondholders are entitled to the income from the Marshfield mortgage district in accordance with their priority from the date of the receivership. This provision seems to entitle them to the income without entry on their part or any demand for the income; that is, upon the appointment of the receiver the income of that mortgage district becomes primarily pledged to the payment of the interest and the principal of these bonds. Although the Marshfield Mortgage Trustees did not intervene until November 8, 1937, the record indicates that the parties, as well as the Court, have recognized the pledging of the income in accordance with Section 8 of the mortgage. Before the first installment of interest became due on May 1, 1933, the receiver, on April 12, 1933, petitioned for instructions as to the payment of this interest. In his petition he set forth Section 8, together with other pertinent provisions of the mortgage, and stated that, in his best judgment and belief, the interest on the bonds had been earned by the portion of the trust estate subject to the lien of this mortgage and recommended the payment of interest. An order to show cause was issued on this petition and a hearing was had, and no one appearing in opposition to the receiver's petition, the interest was paid. During the entire receivership, when semi-annual installments of interest became due, orders of this Court have been issued authorizing such payment, and in all instances the receiver has presented petitions recommending the payment thereof. The balance due on the mortgage at this time is approximately $246,000, and no interest is in default. The mortgage does not become due until 1951.

The Court has been referred to many cases in opposition to the impounding claims of the mortgage bondholders. Some of these cases involve situations in which the receivership was only for the benefit of the one who petitioned for it. Under such circumstances, the court assumed to administer the estate solely for the benefit of the petitioning creditor. Clearly, that situation is to be distinguished from the equity proceeding instituted by the plaintiff bondholder herein. Moreover, none of the decisions are from states which are controlling herein. The parties agree that state law governs. Certainly, there can be no doubt as to the holdings of the Wisconsin and Illinois courts. Sufficient uncertainty does not appear in the Minnesota law to justify a decision based upon certain Federal au-

thority which the objectors herein seek to apply.

The only remaining question which requires discussion is (c), noted above. It arises because the First Refunding Mortgage bondholders contend that, in equity, they are entitled to a reasonable rental for the use and depreciation of certain rolling stock equipment upon which they claim a first lien. The contention is based upon the equitable maxim that he who seeks equity must do equity. The First Refunding bondholders contend that, in compliance with this maxim, the First General bondholders, the S. and D. bondholders, and other creditors who have joined in the receivership cannot now object effectively to the granting of this reasonable rental value, for the equipment was used for the benefit of those bondholders and creditors in the receivership and has aided in maintaining the value of their security during that time. Without the equipment, they argue, the fixed assets, including the realty, of the debtor would have been valueless. Although the right of the Refunding bondholders to a first lien is disputed by the other parties to this proceeding, the right is assumed for the present purposes. The question will be determined at a later date.

The other parties to this proceeding contend that the First Refunding Mortgage bondholders' right to consideration for the use of the equipment upon which they claim a lien lies on an intra-system accounting between the mortgage estates, and in the plan of reorganization, not as an administrative expense payable by the receiver as a prior claim.

In support of their position, the First Refunding Mortgage bondholders cite Kneeland v. American L. & T. Co., 1890, 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379; Myer v. Western Car Co., 1880, 102 U.S. 1, 26 L.Ed. 59; and Thomas v. Peoria & R. I. R. Co., C.C.1888, 36 F. 808, affirmed 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed. 663. But these cases do not seem applicable here. None of them are cases in which the lien of a mortgagee is involved. All involve a situation concerning the rights of a vendor or lessor of personalty to the railroad which was then in reorganization or foreclosure. The opinions, including the statements in the Kneeland case concerning liens of the vendors, necessarily must be read in the light of facts to which they pertain. Although the rights of a vendor or lessor who possesses a lien against roll-ing stock are involved in each case, none of them hold that a mortgagee of personalty enjoys the same rights. In the cited cases, it is clear that the interest of the lessor and conditional vendor in the personalty did not become a part of the trust estate. The cases are not appropriate precedents in this proceeding.

It is the position of the Refunding bondholders that the receivership was instituted by a creditor for the purpose of doing equity as between all creditors; that no interest has been paid on the Refunding mortgage since the inception of the receivership; that the mortgage, therefore, has been in default, and were it not for the receivership and the injunction issued therein against the enforcement of mortgage liens, the Refunding mortgage could have been foreclosed and the personalty sold or leased; that it was the other creditors—the Soo Line and the First General—which intervened in the receivership and were primarily interested in the prevention of any cessation of Wisconsin Central's operations. The Soo Line was interested, they claim, because it was lessee of the debtor's properties, owner of the majority of its capital stock, owner of certain Refunding bonds, guarantor of interest on these bonds, and a holder of unsecured claims against the debtor. The First General was interested, they argue, because any cessation of the debtor's operations would adversely affect its security as first mortgagee on the main line of the debtor's railroad. The Refunding bondholders did not intervene until June 24, 1941, and they were not a party to any application for an injunction restraining the enforcement of creditors' liens. It does appear, however, that the outstanding Refunding bonds at the time of the receivership totaled $15,816,000 and of this amount the Soo Line own some $10,000,000 thereof, and furthermore, that it was the guarantor of the interest on the Refunding bonds. So, at least to that extent, the Refunding interests were a party to the receivership and participated in the proceedings from its very inception. But, outside of the participation of the Soo Line as owner of Refunding bonds, the other Refunding bondholders and the Refunding Mortgage Trustee have sat by, so to speak, without opposing or dissenting from the conduct of the receivership proceedings. They have not asked the Court to vacate the injunction order against foreclosure; neither had

they made any demand for the allowance of the use of equipment upon which they have the mortgage lien until their claim was filed herein. There are no contractual provisions in the mortgage providing for rental on the appointment of a receiver or otherwise, and there is no contract of the receiver, express or implied, which would bind him to pay any rent for equipment on which the lien may have existed.

The fallacy of the Refunding bondholders' contention herein seems apparent. The receivership was for the benefit of all the creditors, including the Refunding bondholders. Their lien extended to the realty as well as to the personalty. If the sale of the personalty would have caused a great loss in the value of the realty upon which other bondholders had their liens, certainly the realty in which the Refunding bondholders had an interest would have decreased in value as well. The Refunding bondholders seek to minimize that fact by pointing out that they consider their interest in the realty of little significance for it was subordinate to that of other bondholders. But, for that very reason, the only hope the Refunding bondholders had to realize anything at all from their claim on the realty was to permit the debtor to retain the rolling stock upon which they claim their lien. The fact that their interest in the realty was subordinate made it even more important for them to insure continuance of the debtor's operations, for the possibility of their obtaining something from their subordinate rights to the realty depended more upon the continued operation of the railroad than upon the intrinsic value of the land as such. The Refunding bondholders do not claim that they are now waiving any of their rights to share in the reorganization as subsequent mortgagees of the debtor's realty. In seeking equity, therefore, it will not avail the Refunding bondholders to speculate as to what could have been accomplished by foreclosure of their mortgage and the sale price or rental which they might have obtained from the rolling stock. It does not appear that, if the rolling stock had been sold under foreclosure early in the receivership, they would have received more than they will now realize from the reorganization. The receivership records herein reflect that additional equipment has been purchased during the receivership, improved in design and in performance. Further, it seems fair to observe that the realty of the other bond-holders necessarily gave value to the equipment; that is, it was the earnings of the railroad as a going concern during the receivership that permitted the repair of equipment and the acquisition of new equipment. Under the circumstances herein, if equity is to consider the use of the equipment by the receiver as administrative expense, then the mortgagees having the first lien on the realty can likewise require the payment of rental on that interest. Thus, all the mortgagees herein could claim compensation as administrative expense for the use of their mortgaged property. The result of the equity receivership would be a matter of administrative adjustment rather than the reorganization of the railroad, which is the end sought in this proceeding.

The Refunding bondholders cite no case which holds that a mortgagee of personalty possesses the rights which they claim here. The general practice and apparent understanding in other railroad reorganization proceedings seem contrary to their position. It seems appropriate to note that the Interstate Commerce Commission has uniformly assumed the allowance of compensation for use of mortgaged equipment to be an item of inter-mortgage accounting. Chicago, I. & L. Ry. Co. Reorganization, 1938, 228 I.C.C. 209, 214; Denver & R. G. W. R. Co., 1939, 233 I.C.C. 515, 571; Chicago R. I. & P. Ry. Co. Reorganization, 1940, 242 I.C.C. 298, 407; Central of Georgia Ry. Co. Reorganization, 1942, 252 I.C.C. 587, 600.

True, the question of allowance for the use of mortgaged personalty as an administrative or operating expense would come before the Court, not before the Commission, but the procedure followed in other reorganization proceedings before the Commission and the absence of any holding by a court that such use should in equity be considered as administrative expense of the receivership lends weight to the objections which have been made to the contention of the Refunding mortgagees.

It follows, therefore, that the request of the Refunding bondholders for payment as an administrative expense of a reasonable rental for the use and depreciation of the rolling stock upon which they claim a first lien must be denied. In view of the Court's holding on this phase of the controversy, the other questions incorporated in (c) do not require discussion.

The final order to be entered herein in harmony with the conclusions indicated may

be submitted on ten days' notice. An exception to the provisions of this memorandum is reserved to each and every aggrieved party.