### KANSAS CITY TERMINAL RY. CO. et al. v. CENTRAL UNION TRUST CO. OF NEW YORK et al.*

(Circuit Court of Appeals, Eighth Circuit. November 5, 1923.)

No. 6217.

1. **Railroads ⊕⟹139—Contracts for joint ownership and maintenance of union station held not to create general lien.**

Contracts between railroad companies relating to joint ownership, maintenance, and use of a union station, which did not purport to be mortgages, or to convey any title or interest in the properties of the several companies, *held* not to create a lien on the general property of a company, which took precedence of a subsequent mortgage.

2. **Railroads ⊕⟹171(3)—Recital in mortgage held not recognition of prior lien.**

Where railroad companies joined in the building of a union station through a terminal company, of which they owned the stock in equal shares, and by agreement deposited the greater part of the stock with a trustee to secure their mutual obligations to maintain and operate the station, the recital in a subsequent general mortgage given by a company that, as to the terminal company stock, it was "subject to the terms of the stock trust agreement," was not a recognition of a prior general lien in favor of the union station contracts, but only of a lien on the terminal stock created by the trust agreement.

3. **Railroads ⊕⟹139—Contracts between companies for joint ownership and use of union station are executory operating contracts, and not covenants running with their property.**

Contracts between railroad companies for the joint ownership and use of a union station are ordinary executory operating contracts, and not covenants which run with the property of the several companies and follow it into the hands of subsequent purchasers.

4. **Railroads ⊕⟹139—Public interest held not to require imposition of lien on property of insolvent company for operation of union station.**

There is no public interest which requires the imposition of a lien on the property of an insolvent railroad company to secure the continued

⊕⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied January 31, 1924. Certiorari denied 44 Sup. Ct. ——, 68 L. Ed. ——.

operation and use of a union station of which it is a joint owner with other companies, where by contract such other owners, who are solvent, are obligated to make good the default of any joint owner in equal proportions, and where, furthermore, the state Public Service Commission has power to compel the continued maintenance and use of the station.

**5. Receivers ⊂⊃81—Cannot create estoppel against party.**
 A receiver acts for the court, and not for either of the parties, and cannot by his acts prejudice the rights of, nor create an estoppel against, a party.

Appeal from the District Court of the United States for the Eastern District of Missouri; Walter H. Sanborn, Judge.

Suit in equity by the Central Union Trust Company of New York and others against the Missouri, Kansas & Texas Railway Company and others, wherein the Kansas City Terminal Railway Company and others intervened. From a decree dismissing the bill of intervention, interveners appeal. Affirmed.

Samuel W. Sawyer, of Kansas City, Mo., and Gardiner Lathrop, of Chicago, Ill. (Edward J. White, of St. Louis, Mo., N. H. Loomis, of Omaha, Neb., R. Bruce Scott, H. H. Field, and W. F. Dickinson, all of Chicago, Ill., N. S. Brown, of St. Louis, Mo., and F. H. Moore, of Kansas City, Mo., on the brief), for appellants.

H. C. McCollom, of New York City, Edward C. Eliot, of St. Louis, Mo. (Nagel & Kirby, Charles W. Bates, Boyle & Priest, Bryan, Williams & Cave, Lee Hagerman, Charles A. Houts, George C. Hitchcock, and Charles P. Williams, all of St. Louis, Mo., Edward Cornell and Charles E. Hotchkiss, both of New York City, Allen C. Orrick, of St. Louis, Mo., Roberts Walker, of New York City, George H. Williams, of St. Louis, Mo., Geller, Rolston & Blanc, Hornblower, Miller & Garrison, White & Case and Masten & Nichols, all of New York City, Richards, Smyth & Conway, of Brooklyn, N. Y., and King, Lane & Trafford, of New York City, on the brief), for appellees.

Joseph M. Bryson, of St. Louis, Mo. (C. S. Burg, of St. Louis, Mo., on the brief), amici curiæ.

Before LEWIS, Circuit Judge, and FARIS and McGEE, District Judges.

FARIS, District Judge. Heretofore, and on the 27th day of September, 1915, an action was begun by the Railway Steel Spring Company, a corporation of the state of New Jersey, as plaintiff, against the Missouri, Kansas & Texas Railway Company, a corporation of the state of Kansas (hereinafter called old company), as defendant, in the form of a creditor's bill, in which such proceedings were had as resulted in the appointment of a receiver for the railroad, defendant therein. Later, actions were begun by the appellees to foreclose certain mortgages, or deeds of trust, made to secure bonds of the old company, in which deeds of trust the appellees were trustees, and which deeds of trust were liens upon all the properties of the old company. All these actions were consolidated by the District Court, and the consolidated case thereafter proceeded with such effect as that a sale under

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
 294 F.—3

a decree of foreclosure of all of the deeds of trust was ordered and had, and upon such sale the properties of the old company were bought by one Hugo W. Blumenthal, and another, who subsequently assigned all rights, property, and privileges accruing to them by such purchase to the Missouri-Kansas-Texas Railroad Company, a new corporation, organized under the laws of Missouri (hereinafter called the new company), to which latter company all the properties of the old company were conveyed, and which now holds and operates them.

Pending the entering of the final decree in the consolidated cause, appellants, Kansas City Terminal Railway Company (the holder of title to the properties of the Union Station at Kansas City, Mo., and of terminals affording ingress and egress to such station), the Illinois Trust & Savings Bank, and one Charles G. Hutcheson (as trustees in a certain deed of trust made by the Kansas City Terminal Railway Company), and nine of the railroad companies, out of twelve, which were parties to certain contracts made and entered into by and between them and the old company, came into the District Court and filed their bill of intervention, praying that the final decree, when entered, should provide that upon the sale of the properties of the old company under foreclosures of the mortgages, the purchaser should take these properties in all things subject to all of the contracts above mentioned and which are hereinafter more specifically described. The St. Louis & San Francisco Railroad Company and the Chicago Great Western Railroad Company, which were parties to these contracts, did not join as interveners. No point is made as to this however, if in fact there be any possible point in it; so no question is made of it here.

The contracts referred to, and which constitute the bases of contention in this controversy, were:

(a) A contract, dated May 21, 1906, between the Kansas City Belt Railway Company (the predecessor of the appellant Kansas City Terminal Railway Company), and the ten railroad companies (including the old company) then having lines of railroad through or into Kansas City, Mo. This contract provided for the transfer of a part of the stock in the Belt Railway, then held by the Atchison, Topeka & Santa Fé Railway Company, the St. Louis & San Francisco Railroad Company, and the Chicago, Milwaukee & St. Paul Railway Company, to the old company, and to six other railroad companies, then having terminals in Kansas City, and for the subsequent transfer of such stock to the Fidelity Trust Company, in trust, to be held by the latter until further conditions of the contract were complied with. It was also agreed that a new union station should be erected in Kansas City, and certain further trackage acquired, so as to afford a complete double belt track around the north and west sides of Kansas City. To these new facilities, as well as to existing facilities, each of the ten signatory railroad companies was to have access and use, without preference. The fixed charges, including taxes, for all such facilities, were to be borne by the signatory railroad companies equally; that is to say, each company was to pay one-tenth thereof. The cost of operation and maintenance was to be borne by the ten railroad companies, but to be apportioned for payment upon a wheelage basis. By this

contract it was further provided that each railroad company should have a representative on the board of directors of the Terminal Company (then the Kansas City Belt Railway Company).

(b) A contract, called the "operating agreement," made on the 12th day of June, 1909, by and between the terminal company, of the first part, the ten railroad companies, of the second part, and the Illinois Trust & Savings Bank, as trustee, of the third part. This operating agreement provided for the furnishing to such railroads of terminal tracks and facilities for passenger trains and coaches, including sleeping cars, passengers, mail, and express, and for the use, under conditions, of the terminal company's tracks for freight trains, for the term and period of 200 years. As foreshadowed by the presence of a trustee in this contract, a deed of trust securing not to exceed $50,000,000 of bonds was agreed to be made by the terminal company. The principal and interest of these bonds were to be paid by the ten railroad companies in equal proportions, as the same fell due, and, if default should be made by any one or more of the ten contracting railroad companies, such sum so in default should be paid by the others, each contributing its proportionate part thereof. Each of the contracting railroad companies bound itself to use the terminal facilities for all passenger trains, except suburban trains, for the full term of the contract, and it was agreed that:

"The several covenants, conditions, and stipulations of this agreement shall be binding upon and inure to the benefit of the respective parties hereto, their successors, lessees, and assigns. No assignment by any of the railway companies of any interest or right under this agreement, whether in connection with the sale of the assigning railway company's railway and other property or otherwise, shall release such assigning railway company from any of its obligations under this agreement. If any of the railway companies should be consolidated, the consolidated company shall be liable to make all payments and to perform all obligations hereunder which would be obligatory upon each of the constituent companies as if such consolidation had not been made."

It was also provided that this operating agreement should be and it was by the terms thereof—

"transferred and assigned to the trustees under said first mortgage of the terminal company by way of further security for the bonds issued under and secured by said mortgage and such other bonds as may be issued in accordance with the terms thereof, and it is hereby covenanted and agreed by and between the parties hereto that this agreement is subject to the lien of said first mortgage and that said trustee company shall have the right and power in its own discretion to enforce and require the enforcement of any and every covenant herein contained."

(c) On the same day—that is to say, on the 12th day of June, 1909—the ten constituent and contracting railroad companies, as parties of the first part, entered into a contract, called the "stock trust agreement," with the Pioneer Trust Company, trustee, as party of the second part, and the Kansas City Terminal Railway Company, as party of the third part, pursuant to which it was agreed that of the 1,000 shares of stock, then held by each of the ten constituent railroad companies, 995 shares thereof should be transferred to the Pioneer Trust Company, and that each of these railroad companies should retain 5 shares only, as qualifying shares. Such trustee was empowered to hold such 9,950 shares

as a stockholder, subject to the terms of this agreement; but so long as a constituent company was not in default under the terms of the operating agreement hereinabove mentioned it was entitled to vote all of its 1,000 shares of stock. Generally this agreement provided for further assurance that each of the constituent companies would in all things comply and carry out the provisions and covenants of the operating agreement. All dividends earned by the 9,950 shares of stock, so transferred to the trustee, were to be paid by the trustee to the railroad company owning such stock, so long as such owner was not in default; but if default occurred on the part of the railroad, actually owning the stock so held in trust, the dividends were to be paid to such other of the contracting railroad companies as were not in default, in order to compensate them, in part at least, for the contributions which they were obligated to make upon default of any one or more of the constituent companies, pursuant to the terms of the operating agreement.

(d) Later, and on the 24th day of January, 1910, contracts called the "first supplemental operating agreement" and the "first supplemental stock trust agreement" were entered into. These agreements add nothing to the story, for by the terms thereof the Chicago Great Western Railroad Company and the Kansas City Southern Railway Company were admitted as users of all terminal facilities and became parties as constituent members to all contracts hereinabove mentioned; the only change in the situation being that thereafter each of the contracting railroad companies was obligated to bear one-twelfth of all financial burdens, instead of one-tenth as theretofore.

Below, the case rode off on a motion to dismiss the bill of intervention, which was sustained, in so far as concerned the alleged right to have the contracts above mentioned and analyzed declared in and by the final decree to be liens superior to the mortgage liens, and therefore to follow and bind the vendees of the properties of the old company upon foreclosure sale, in the hands of such vendees or their assigns.

Some question is raised touching whether, inherently and upon its face, the bill of intervention was not in fact good as pleaded. But clearly the case ought not to be ruled finally upon the broad issue in controversy, upon a mere matter of procedure and practice. The relief sought by the bill of intervention was to have the proposed final decree so modified as to adjudge that the purchasers at the foreclosure sale should take the properties of the old company subject to the performance by the new company of all the covenants and agreements contained in the contracts set out above. This the court nisi, with the whole case and situation before it, refused to adjudge. To this alleged error all of the assignments of error, save one, are directed. This situation regarded, it is too obvious for argument that, if the court erred below, such error arose directly from the fact that the trial court refused (a) to adjudge and decree, in the final decretal order, that the right and equities of appellants are prior in lien and superior in equity to the rights and equities of the holders of bonds secured by the various foreclosed mortgages including the consolidated mortgage; (b) that the contracts above mentioned, analyzed, and discussed are binding upon any purchaser at the foreclosure sale had under the final de-

cree, and that the same must be adopted and assumed by such purchaser as a condition of acquiring and holding the property of the mortgagor, old company; and (c) affirmatively that the court erred in decreeing that the purchaser at the foreclosure sale should have one year from the date of the deed of conveyance and taking possession of the property in which to elect whether such purchaser would adopt or refuse to adopt the above contracts, made by the old company.

[1] Each of the nine mortgages foreclosed by the final decree (save and except the consolidated mortgage, which was dated April 1, 1910) was prior in point of time to any of the contracts now here urged as superior liens as against such mortgages. It is contended by appellants that the fact that the consolidated mortgage was dated some ten months after the contracts were made makes it inferior as a lien to these contracts. This contention seems to be answered by what was said in the case of Des Moines, etc., Railroad Co. v. Wabash, etc., Railway Co., 135 U. S. loc. cit. 581, 10 Sup. Ct. 755, 34 L. Ed. 243, where it is said:

"It will be observed that this contract does not purport to be a mortgage on the railroad of the Adel Company; that it does not convey in proper terms any title to the railroad itself, or to its appurtenances, or any interest in them; and that it does not secure, as a lien upon the roads, any particular sum of money. It declares that the contract and any damages from a breach of the same shall be a continuing lien upon the roads of the two contracting companies. It is difficult to conceive how the contract, abstractly considered, could be a lien upon the roads of the companies, and not much easier to see what damages for the breach of such contract are made a lien upon the roads of the two companies. There is nothing in the language of this sentence, nor in the nature of the contract, which should make it one running with the land, or one chargeable upon the railroad, when by due course of law, or in any other mode, the property passed to other hands."

[2] It is also very seriously urged that the consolidated mortgage, by its terms recognized the existence of a lien in favor of the contracts which was superior to that mortgage. The language of the mortgage relied on as a basis for this contention is found only in the list of the properties conveyed, where it is recited:

"995 shares of the capital stock of Kansas City Terminal Railway Company, subject to the provisions of the stock trust agreement, dated the 12th day of June, 1909."

It is fairly obvious that this language means merely that the stock was to pass subject to the prior lien on such stock held by the Pioneer Trust Company. The language quoted fell far short of a recognition of the seniority of the lien alleged as existing upon all of the property of the old company in favor of the contracts here under discussion.

[3] These contracts are conceded to be executory contracts. But, absent the concession, they are so clearly such as to obviate the necessity of a discussion of the question. Being executory, are they by reason of any peculiar fact, of such sacrosanct character as to relieve them from falling into the category of ordinary executory contracts entered into by a railroad as aids to its operation? We lay aside for subsequent reference the contention that such contracts are so far coupled with a public interest, as to take them out of the usual rule, and conclude that these contracts are only of the nature of personal promises, and that they are not covenants running with and binding the prop-

erties in the hands of whomsoever they may come. Gilchrist v. Street Railway Co. (D. 'C.) 246 Fed. 925; Express Co. v. Railroad Co., 99 U. S. 191, 25 L. Ed. 319; Ames v. Union Pacific Ry. Co. (C. C.) 60 Fed. 966; Des Moines R. R. Co. v. Wabash Ry. Co., supra. They are, it is true, contracts of the old company, valid, subsisting, and binding on it, perhaps, though we are not called to rule that question, except arguendo; but they do not follow the property, and are not binding upon the purchasers, upon a foreclosure sale. The same thing may be said touching validity and binding quality of any contract made by a going railroad. But it is fairly obvious that if all executory contracts, or even contracts already fully executed upon one side, were held to be liens superior to those of either prior or subsequent mortgagees, there would result such a pyramiding of debts as eventually to submerge all railroads, and effectually preclude the obtainment of money by a railroad through the hypothecation by a mortgage of its physical properties.

Touching this contention of appellants, that the purchasers under the foreclosure sale are bound to assume the obligations and liabilities of the old company, in all things pursuant to the contracts of such company with the terminal company and the 11 other constituent railroad companies, the learned trial judge said:

"The imposition of the burden of the liability of the mortgagor company upon the purchaser at the proposed foreclosure sale is in reality the imposition of that burden upon the holders of the bonds secured by the mortgages in foreclosure, all of which but one, the consolidated, antedate the terminal agreements. The holders of these bonds cannot be lawfully deprived of their security by subsequent liabilities incurred by their mortgagor unless such liabilities fall in the class of the few preferential claims that may be given liens superior to prior mortgages, and this is not one of this class of claims. A sale under a foreclosure decree is a sale of the property, not a sale of the liabilities of the mortgagor. The terminal company itself holds no equity that will suffer, if the burden of this liability is not imposed upon the purchaser because the 11 constituent companies who voluntarily agreed to bear this burden will bear it. The bondholders purchased their bonds in reliance upon the fixed and superior liens of their mortgages and on the rule of law that the lien first in time is ordinarily superior in right and in equity and these bondholders never agreed to pay or to bear this burden subsequently incurred by the mortgagor."

The case of Baker v. Central Trust Co., 235 Fed. 17, 148 C. C. A. 511, seems to be wholly apposite to the situation confronting us here. The latter case, both upon the facts held in judgment and upon principle, seems to rule this case, persuasively at least. Such differences as subsist are apparent, rather than real, and the principle involved seems precisely identical. Nor, as forecast above, is the rule announced affected by the fact that one of the mortgages which was foreclosed was executed subsequent to the execution of the contracts in controversy; for, in the last analysis, these contracts imposed only financial burdens upon the old company. This identical situation, as to seniority in point of time in the execution of the contract and the mortgage, respectively, was before the court in the case of Des Moines, etc., R. R. Co. v. Wabash, etc., Ry. Co., supra, and it was discussed in the excerpt quoted above from that opinion, though the legal foundation for the rule announced is not explicitly set down therein. That foundation would seem to be that, as between two creditors, he who is

foresighted enough to take security for his debt is preferred as against him who fails to do so,

[4] Counsel for appellants strenuously insist that the public has an interest in the continued operation of these terminal facilities, and that such an interest presents crying equities making for the continuance of the status created by these contracts and existing before foreclosure. That status is, however, not presently threatened. The danger feared by appellants is not impending and immediately about to happen. In fact, in apparent prophecy that this situation might some time present itself, the very contracts in issue here provide that, upon default of any one or more of the 12 constituent companies, the remaining companies shall operate and maintain these terminal facilities. The Missouri Public Service Commission, we judicially notice, has power, under the supervision of the courts, to compel such continued use of these facilities by the several railroads passing through or into Kansas City, under such conditions, terms, and regulations as it may deem fair, just, and equitable to all concerned, including the public. Section 10458, R. S. Mo. 1919; State ex rel. v. Public Service Com., 271 Mo. 155, 196 S. W. 369. In other words, the Public Service Commission and the courts, in which its rulings are revised, are saddled with the duty of safeguarding the interest of the public touching the use vel non of these terminal facilities. We ought not to assume in advance of the fact that this duty will not be justly and equitably performed. The use of these terminal facilities is so patently for the benefit, both of the public and of all railroads entering Kansas City, that it is difficult to conceive that any such railroad would ever actually cease to use such facilities, or that any such railroad would ever be permitted by the Public Service Commission to cease using them. The question, of course, might arise, and would arise, perhaps inevitably, whether the terms and conditions of such use were fair, just, and equitable to all lines of railroad using these facilities, and this question can be threshed out by the Public Service Commission and those courts having revisory power over its orders, when and as it shall arise. It requires no second sight or prophetic vision to induce a profound suspicion that the itching question here is, not whether the new company shall stay in, but the terms and conditions on which it shall stay in.

It follows that the remoteness of injury to the public, if not the utter impossibility of it, renders very serious consideration of the question unnecessary. Besides, as was well said by the trial court, private property cannot be taken for public use without just compensation, and if this court should saddle an unjust and expensive burden upon the purchasers of these properties, even upon the ground of present hurt to the public, this would be equivalent to such a taking and to confiscation. A fortiori, is this true, when possible hurt to the public is merely debatable, and so far distant as to be well-nigh invisible.

[5] It is further urged that the receiver, appointed by the District Court to operate the properties of the old company, has by continuing to use these facilities during the receivership, estopped the bondholders, at whose request he was appointed, and that these bondholders may not therefore be heard to insist that the purchaser at the foreclosure sale shall take these properties free of the burden imposed by the contracts

in controversy. Absent a decree by the appointing court to that specific end, the receiver had no authority to bind either the bondholders or the purchasers by his action in continuing to use these facilities, or by his participation, pending the receivership, as a member of the directorate of the company. Chicago, etc., Co. v. McNulta, 153 U. S. 554, 14 Sup. Ct. 915, 38 L. Ed. 819; Farmers', etc., Co. v. Chicago, etc., Ry. Co. (C. C.) 44 Fed. 653. Some of the reasons for the rule would seem derivable from the inherent nature and office of a receiver. He is ordinarily neither an adversary nor a protagonist of the parties to an action, but a person indifferent between adversaries, who is appointed as the representative and arm of the court, for the equal benefit of all parties having rights in the case. He possesses no power save such as may be given him by the court which appoints him. Davis v. Gray, 16 Wall. loc. cit. 218, 21 L. Ed. 447. In the light of such office and such limitation of functions, it is impossible to perceive any legal foundation for the contention that a receiver has the power to create a situation wherein the necessary elements of an equitable estoppel would be present.

We are constrained to conclude that the view taken by the learned trial court was correct, and that the case ought to be affirmed, which is accordingly ordered.