## KANSAS CITY TERMINAL RY. CO. et al. v. CENTRAL UNION TRUST CO. OF NEW YORK et al.*

Circuit Court of Appeals, Eighth Circuit.
July 7, 1928.

No. 6457.

Samuel W. Sawyer, of Kansas City, Mo. (Edward J. White, of St. Louis, Mo., N. H. Loomis, of Omaha, Neb., R. Bruce Scott and Gardiner Lathrop, both of Chicago, Ill., N. S. Brown, of St. Louis, Mo., W. F. Dickinson and H. H. Field, both of Chicago, Ill., and F. H. Moore, of Kansas City, Mo., on the brief), for appellants.

Joseph M. Bryson, of St. Louis, Mo., for appellee Missouri-Kansas-Texas R. Co., and Francis F. Randolph and Hugo W. Blumenthal, and Arthur H. VanBrunt, of New York City, for Randolph and Blumenthal (Albert Rathbone, of New York City, for Randolph and Blumenthal; Edward Cornell and Charles E. Hotchkiss, both of New York City, and Edward C. Eliot, of St. Louis, Mo., for Central Union Trust Co. of New York, trustee under consolidated mortgage and under trust agreement; Geller, Rolston & Blanc, of New York City, and Nagel & Kirby, of St. Louis, Mo., for Farmers' Loan & Trust Co., trustee under refunding mortgage and under St. Louis division mortgage; Hornblower, Miller & Garrison, of New York City, and Charles W. Bates, of St. Louis, Mo., for New York Trust Co., trustee under general mortgage; Boyle & Priest, of St. Louis, Mo., for Edwards, as trustee under general mortgage; White & Case, of New York City, and George H. Williams, of St. Louis, Mo., for Bankers' Trust Co., trustee under second mortgage; Masten & Nichols, of New York City, and Lee W. Hagerman, of St. Louis, Mo., for Columbia Trust Co. [now Irving Bank-Columbia Trust Co.], trustee under the first mortgage of M., K. & E. Ry.; Richards, Smyth & Conway, of Brooklyn, N. Y., and Charles A. Houts, of St. Louis, Mo., for Central Union Trust Co. of New York, trustee under second mortgage of Missouri, K. & E. Ry. Co.; King, Lane & Trafford, of New York City, and George C. Hitchcock, of St. Louis, Mo., for Central Union Trust Co. of New York, trustee under first extension mortgage; Charles P. Williams, of St. Louis, Mo., for Farmers' Loan & Trust Co., trustee under South Western Coal & Improvement Co. first mortgage; and Nicholas Kelley and H. C. McCollom, both of New York City, Allen C. Orrick, of St. Louis, Mo., and Roberts Walker, of New York City, of counsel, all on the brief), for appellees.

Before STONE and KENYON, Circuit Judges, and FARIS, District Judge.

STONE, Circuit Judge. This is an appeal from an order and decree of the District Court made on February 9, 1923, holding that an offer to unsecured creditors in connection with a railroad foreclosure and reorganization was fair, just, equitable and timely, and made to and applicable to appellants; from an order and decree made on the same day confirming the foreclosure sale; and from an order and decree made on March 10, 1923, directing the execution and delivery of a master's deed to Missouri-Kansas-Texas Railroad Company and providing that the grantee should take free of all claims except as in the order provided.

The main questions are (a) whether the offer to creditors was made to and applicable to the appellants, and (b) if so, whether it was fair, and sufficient to relieve the new Missouri-Kansas-Texas Railroad Company from the obligations of certain operating agreements and stock trust agreements made by the old company with appellants.

The main proceeding was begun by a creditor's bill filed against the Missouri, Kansas & Texas Railway Company by the Railway Steel Spring Company, upon which a receiver was appointed. Afterwards the suit was consolidated with a suit upon a creditor's bill filed by D. B. Hussey and with several suits for the foreclosure of various mortgages of the Missouri, Kansas & Texas Railway Company, and the receivership was extended to the consolidated cause.

The appellants (who are the Kansas City Terminal Railway Company, the trustees under its mortgage, and various railway companies, which are owners of its stock and have contracted to use its facilities) filed in the consolidated cause their intervening petition, and later a supplemental and amended intervening petition, asking that certain operating and stock trust agreements between them and the defendant, Missouri, Kansas & Texas Railway Company, be held prior in lien and superior in equity to the mortgages of the defendant, Missouri, Kansas & Texas Railway Company, and binding on any purchaser at the foreclosure sale and for other relief.

These contracts provided for the construction of a union station and terminal facilities by the Terminal Company and for their use by each of the proprietary companies, including the Missouri, Kansas & Texas Railway Company, for a period of 200 years. Each of these proprietary companies covenanted by the contracts to pay an equal part of all interest on the Ter--

minal Company's first mortgage bonds and of all taxes payable by the Terminal Company and, also, a part of the expense of maintenance and operation of the terminal facilities to be determined upon the basis of use. Each of the proprietary companies likewise retained an equal equitable interest in the stock of the Terminal Company and an equal voice in its control.

Upon entering a final decree of foreclosure on June 30, 1922, the court held that the contracts were not entitled to preference, and hence were not binding on the purchaser unless the purchaser should elect to adopt them, and entered a final decree of foreclosure which contained a provision that the purchaser should have one year after delivery of the master's deed within which to elect whether to adopt or reject contracts of the old company (including the contracts in question). An appeal was taken from this order and decree to this court, and the order and decree were affirmed. Kansas City Terminal Railway Co. v. Central Union Trust Co., 294 F. 32.

Article nineteenth of the decree of foreclosure contained the provisions following:

"Provided, however, that no sale hereunder of any property shall be confirmed to any purchaser who shall purchase said property on behalf of, or for the benefit of, any corporation organized, or to be organized, for the purpose or with the intention that it shall become the owner of said property, or any part thereof, or any beneficial interest therein, through any sale under this decree, pursuant to any scheme, plan or agreement whereby any stockholder or stockholders of the railway company shall receive any stock, bonds or other beneficial interest in such corporation on account of their stock in the railway company, although he or they may pay some other consideration in addition therefor, unless and until there shall have been made under, or pursuant to, or in connection with, such scheme, plan or agreement, to creditors (a) of the railway company who have presented their claims in accordance with the orders of this court in this consolidated cause, or in any constituent cause, and who have claims subordinate in lien and inferior in equity to the second mortgage, or to the extension mortgage, or to the Eastern first mortgage or to the Eastern second mortgage, or to the St. Louis division mortgage, or to the Southwestern mortgage, or to the refunding mortgage, or to the general mortgage, or to the consolidated mortgage, and * * * a fair and timely offer of cash, or a fair and timely offer of participation in such corporation through stocks, bonds or otherwise; and this court reserves jurisdiction to determine whether such an offer to such creditors has been made under, or pursuant to, or in connection with, any such scheme, plan or agreement, and jurisdiction to modify this decree in case it determines that no such offer has been made. The special master shall accept no bid from any one who shall not, prior to any offer by the special master for sale under this decree, file with the special master a statement whether he proposes to bid on behalf of any such corporation, and if so, also file a complete statement of any such scheme, or a copy of such plan or agreement, and a statement of any offers (other than offers to a class of secured creditors which have been accepted by all creditors of such class) which have been made to such creditors under, or pursuant to, or in connection with such scheme, plan or agreement.''

A reorganization plan and agreement (dated November 1, 1921) had been promulgated before the entry of the above decree. Following the decree, the reorganization managers issued an offer to creditors (dated July 15, 1922) evidently in pursuance of the provisions of the decree. This offer was addressed "to holders of claims * * * which have been presented in accordance with orders of the United States District Court for the Eastern District of Missouri * * * or which have arisen or may arise after the entry of the decree of foreclosure and sale by said court in said consolidated cause," termed in the offer "general creditors." The offer made no specific provision for the appellants, nor the appellants' contracts, nor terminal and operating contracts generally, nor executory contracts, nor contingent claims.

On September 15, 1922, the appellants filed in the District Court an application for leave to file their supplemental intervening petition and objections to confirmation of sale. This pleading alleged that Missouri-Kansas-Texas Railroad Company had been organized for the purpose of buying at the foreclosure sale; that it was organized in pursuance of a reorganization plan and agreement, by which the stockholders of the old Missouri, Kansas & Texas Railway Company would receive stocks, bonds or other beneficial interests in the new corporation on account of their stock in the old company; that the interest thus preserved by the reorganization plan to the stockhold-

ers in the old company was of great value (upon "information and belief" in excess of $30,000,000); that the reorganization managers designated by said plan and purporting to act under article nineteenth of the decree of foreclosure had promulgated an alleged offer to creditors dated July 15, 1922; that this offer, for reasons specifically stated in the pleading, was wholly unfair, inequitable and inapplicable to these appellants, and made no provision for the rights of these appellants; and that the time given for acceptance of the offer was unreasonably short. The court on the same day granted leave to file the application, but reserved for future determination the question whether leave should be given to file the supplemental intervening petition and objections to confirmation of sale and all questions arising thereunder.

Afterwards, a sale was had under the foreclosure decree, and the special master, on December 18, 1922, filed his report of sale. To the report of sale were attached (as exhibits) a bidder's statement, a copy of the plan and agreement of reorganization, which provided for participation by the stockholders of the old company in the securities of the new company, and a copy of the offer to creditors made by the reorganization managers.

The case came on for hearing on February 5, 1923, on an application to confirm the foreclosure sale, and on the above mentioned application of these appellants for leave to file their supplemental intervening petition and objections to the confirmation of sale. A full hearing was had, evidence taken, and the court took all matters under advisement. On February 9, 1923, the court entered an order and decree (1) granting leave to the appellants to file their supplemental intervening petition and objections to confirmation of sale (which was accordingly done on the same day); (2) holding "that the offer to the unsecured creditors was and is fair, just, equitable and timely; that under the final decree it was properly and duly made to the interveners before the application for the confirmation of the sale and again at the hearing upon that application on February 5, 1923''; (3) extending the time for the appellants to accept or reject the offer until 90 days after the purchasers at the sale or their successor should elect whether or not to adopt the operating contracts in question. At the same time, the court entered a final order and decree confirming the master's report and the sale to Francis F. Randolph and Hugo W. Blumenthal.

Afterwards, an assignment was made by the above purchasers to Missouri-Kansas-Texas Railroad Company, a corporation previously organized under the laws of the state of Missouri, for the purpose. Deed of conveyance was made to this company by the master and by the purchasers and the form of deed was approved by the court on March 10, 1923, by an order and decree which directed the execution and delivery of the deed and also provided that the grantee should take free of all claims except as in said order and decree and in the decree of foreclosure provided.

This appeal is from these orders and decrees of February 9, 1923, and March 10, 1923.

The appellants' position briefly is as follows:

(1) That the offer by its terms was not appropriate to the claims of the appellants; did not describe the appellants' contracts nor even continuing contracts generally; contained no language which was applicable to such claims or contracts; and consequently, even though served upon the appellants, was not in fact an offer made to them.

(2) That, even if the offer was applicable to and made to the appellants, it was not a fair and timely offer of cash or participation within the decisions of the Supreme Court and of this court; and consequently,

(3) That the purchasers and their assigns, having failed to comply with the requirements of the decisions of the Supreme Court and of this court by making such a fair and timely offer, are liable upon these contracts of the old company and bound in equity to carry them out.

In determining the above contentions, we will consider the second contention last.

## I.

In so far as the first point involves the contention that the offer was not actually made to appellants, it is met by the clear evidence in the record. Not only are the terms of the final decree sufficiently general to include appellants, but at the hearing on February 5, 1923, it was expressly and pointedly stated on behalf of those representing the opposition that it did apply to them and was then and there renewed.

The main idea of the first contention, however, is that a contract of this character cannot be dealt with as an ordinary indebtedness and covered by an offer of money or property intended to meet the entire liability under the contract. The reason

set forth for this position is the impracticability, if not impossibility, of estimating the liability and damage arising from a total breach of a contract of this character.

The contention that damages cannot be an adequate compensation because of the difficulty of ascertainment is not helpful to appellant. Unless it can bring itself within the "creditor" classification it is without the reasoning and rule of both the Boyd (228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931) and the Pierce (255 U. S. 398, 41 S. Ct. 365, 65 L. Ed. 697) Cases. Those cases were dealing with the subject of creditors following assets. The obligation of a succeeding corporation to perform executory contracts of their predecessors is entirely another matter involving situations and legal principles different from those stated in the Boyd and Pierce Cases. There is nothing in either of those cases which in any way touches the legal duties of *performance* of executory contract by companies which succeed to the entire assets of one of the parties to the contract. It is true that the court, in the Pierce Case (255 U. S. 398, 403, 41 S. Ct 365, 367 [65 L. Ed. 697]) said: "A corporation cannot by divesting itself of all property leave remediless the holder of a contingent claim, or the obligee of an executory contract. Baltimore & Ohio Telegraph Co. v. Interstate Telegraph Co. [C. C. A.] 54 F. 50." However, that language was used in connection with the contention then being considered which was that a debt could not be enforced against assets, which had been distributed to stockholders, because the debt had not been established "until a year after the company had divested itself of the property sought to be reached in this suit." 255 U. S. 403, 41 S. Ct. 367, 65 L. Ed. 697. Whatever may be the rules of law which enable a party to an executory contract to compel performance thereof by a successor to the entire assets of the other party, such rules are not here applicable. That matter was finally settled by this court, on a former appeal, between these same parties. 294 F. 32. Unless appellant is a creditor of the old company, it has no standing to question the fairness of the terms of the reorganization.

## II.

The contention that, if this offer to appellants cannot stand, the purchasers are liable to carry out the contracts of the old company, is unsound. This is so for reasons set forth in connection with the discussion of point I, above, of the character of this contract and its relation to this reorganization. But there is another very definite reason in the decision of this court on the prior appeal (294 F. 32), wherein it was held that this contract did not pass to the purchasers. If it did not pass to the purchasers, they cannot be made to assume it, under the terms of this reorganization or otherwise. If the offer made in the reorganization plan is not fair, then it leaves appellants with a claim for damages against the old company on account of the total breach of the Terminal contracts. Those damages constitute a claim by an unsecured creditor of the old company in an amount hereafter to be ascertained. That claim is entitled to all of the rights of such an unsecured creditor in the reorganization or otherwise and to no others.

## III.

The next inquiry is whether the terms of the offer to creditors, made a part of the reorganization plan, were fair. This involves (a) a statement of the applicable rules of law and (b) an understanding of the facts as to what those offers really were. In determining the facts we will consider (b–1) the situation to which the plan was to apply and (b–2) the plan of reorganization.

### (a) The Applicable Law.

When this court came to consideration of this appeal, it deemed it necessary to certify to the Supreme Court certain important questions.

That certificate contained three questions as follows:

"I. Is a plan of reorganization of a railway company sufficient as to unsecured creditors and binding upon them which does not give precedence to the entire claim of the creditor over any part or interest of a stockholder in the old company?

"II. Is such a plan fair and binding upon such creditors even though they be offered securities of the same grade as the stockholders, the difference being only in the greater amount offered the creditors, provided the court shall be of the opinion that the offer tenders to such creditors all that could reasonably be expected under all of the existing circumstances?

"III. Is such offer as to such creditors fair and binding if it consists only of the same grade of securities as offered the stockholders, the difference being that the right of the stockholders to participate is conditioned upon the payment of an assessment or the payment of a relatively great-

er assessment than that asked of such creditors, provided the court shall be of the opinion that the offer tenders to such creditors all that could reasonably be expected under all of the existing circumstances?''

With certain definitions and qualifications, the Supreme Court answered the first question in the negative and the two other questions in the affirmative. Counsel have. requested and been accorded another hearing and briefs have been filed upon the effect of the opinion of the Supreme Court upon the facts of this case.

That opinion (271 U. S. 445, 46 S. Ct. 549, 70 L. Ed. 1028) declared that "the 'fixed principle' according to which * * * the character of reorganization agreements must be determined," and to which "there should be rigid adherence" (271 U. S. 454, 46 S. Ct. 551, 70 L. Ed. 1028), was as follows (271 U. S. 453, 46 S. Ct. 551, 70 L. Ed. 1028):

"That where the value of corporate property to be sold under foreclosure is so great as to render cooperation between bondholders and stockholders essential in order to secure a bidder and prevent undue sacrifice of their interests, they may enter into a fair and open arrangement to that end. But 'no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders he may do so, but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation.' Louisville Trust Co. v. Louisville Railway Co. [174 U. S.] 683, 684 [19 S. Ct. 827, 43 L. Ed. 1130].

"This doctrine is the 'fixed principle' according to which Northern Pacific Railway Co. v. Boyd [228 U. S.] 507 [33 S. Ct. 554, 57 .L. Ed. 931], declares the character of reorganization agreements must be determined; and to it there should be rigid adherence. But, as that opinion states, this does not require the impossible and make it necessary always to pay unsecured creditors in cash before stockholders may retain any interest whatever in the reorganized company. By way of illustration it further pointed out, that such creditors can be protected 'by the issuance, on equitable terms, of income bonds or preferred stock.' And we now add that, when necessary, they may be protected through other arrangements which distinctly . recognize their equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation, and afford each of them fair opportunity, measured by the existing circumstances, to avail himself of this right.

"Unsecured creditors of insolvent corporations are entitled to the benefit of the values which remain after lienholders are satisfied, whether this is present or prospective, for dividends or only for purposes of control. But reasonable adjustments should be encouraged. Practically, it is impossible to sell the property of a great railroad for cash; and, generally, the interests of all parties, including the public, are best served by co-operation between bondholders and stockholders. If creditors decline a fair offer based upon the principles above stated, they are left to protect themselves. After such refusal they cannot attack the reorganization in a court of equity. Northern Pacific Railway Co. v. Boyd [228 U. S.] 508 [33 S. Ct. 554, 57 L. Ed. 931].

As to methods of working out reorganizations (which include stockholders) and applying the above ''principle,'' the opinion declares that it is not always necessary to pay unsecured creditors in cash (271 U. S. 454, 46 S. Ct. 551, 70 L. Ed. 1028), but that they may be protected by issuance of bonds or stock superior in rank to that accorded the stockholder (271 . U. S. 454, 46 S. Ct. 551, 70 L. Ed. 1028), or, when necessary, "through other arrangements, which distinctly recognize their equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation, and afford each of them fair opportunity, measured by the existing circumstances, to avail himself of this right" (271 U. S. 454, 46 S. Ct. 551, 70 L. Ed. 1028). Nor (the opinion states) is it always necessary that the securities offered general creditors "be superior in rank or grade to any which stock-

holders may obtain" but "the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights" and accord the creditor his superior rights "in other ways" (271 U. S. 455, 46 S. Ct. 552, 70 L. Ed. 1028)—such as by "different amounts of the same grade of securities" and by adjustment of assessments, where such are demanded (271 U. S. page 456, 46 S. Ct. 552, 70 L. Ed. 1028).

■■ We think the effect of this opinion may be summarized as follows: That, in any reorganization embracing stockholders, the prior rights of unsecured creditors against all of the property involved must be preserved; that such reorganizations and the preservation of such creditor prior rights are practical matters; that, therefore, what constitutes such priority of treatment depends upon the circumstances and necessities of the particular situation; that determination thereof largely rests in the "informed discretion" of the chancellor "concerning the practical adjustment of the several rights."

Matters of fact bearing upon the exercise of this discretion by the chancellor are noted in the opinion (271 U. S. 453, 46 S. Ct. 551, 70 L. Ed. 1028) as being "amount or character of the insolvent company's outstanding securities, * * * the amount of the unsecured indebtedness, * * * the probable value of the equity in the property beyond secured debts, * * * the amount of money deemed necessary to insure successful operation of the new company." We do not understand the above enumeration as intended to be exclusive of any and all other pertinent facts bearing upon the particular situation. However, the matters enumerated are such as would, in their nature, be present and require consideration in all or nearly all such reorganizations of insolvent companies. In short, each such reorganization must be examined and determined in a practical way with a view of preserving the prior rights of unsecured creditors as far as may be having in mind the necessities of the situation of the particular property.

■ In its broadest aspect, the "situation" of such a property usually is that it is necessary to continue the business to prevent sacrifice of the interests of existing creditors and, more incidentally, of stockholders (where the business is a public utility, there is the superimposed obligation to the public to continue operation); that to continue such operation, new capital is a prime necessity; that such new capital can best be procured from those who (creditors or stockholders) have existing financial interests in the property; that some attraction to induce such investments must be offered in order to secure them. The main *practical purpose* is to secure the required new capital. The main *legal requirement* is that the rights of creditors and stockholders shall conform to existing practical necessities in such a manner as will least disturb the legal priority of the creditors. When this is accomplished, all that can (in a practical and a legal sense) be done has been done; the plan is "fair" to all and the courts will not interfere. The pre-existing rights of creditors and of stockholders must reform and conform to fit the existing rule of necessity. Obviously, such a view is just to all.

■ Such "fairness" can be tested only by comparing the offers of participation made respectively to the general creditor and to the stockholder and this comparison must be in the light of the existing situation.

### (b) The Facts.

■■ At the threshold of such a test in this case, we are met by a preliminary contention respecting the burden of proof as to such "fairness." Wherever that burden may lie in the trial court, there is no doubt concerning it in this court. It is firmly established that when a matter is committed to the sound discretion of a chancellor, his determination thereon will not be set aside unless clearly shown to be erroneous. The wisdom of this rule is accentuated where the matter involved is the reorganization of an insolvent property in receivership under the chancellor approving or disapproving the plan of reorganization. The administration of an insolvent operating property during receivership is so largely a practical business matter that the chancellor gains an experience and insight into the property, its condition, its needs and the relative attitude of interested parties which can never, in its entirety, be transmitted to the printed record. From this intimate association with the property must necessarily come no inconsiderable portion of the "informed discretion concerning the practical adjustment" of the chancellor. As was well said by Judge Sanborn in the Frisco receivership (North American Co. v. St. L. & S. F. R. R. Co. (D. C.) 28 F.(2d) 174):

"In the consideration of that question the court cannot divest itself of experience, nor of its knowledge of the course of pro-

ceedings in the receivership, and the relations of the lienholders, creditors and stockholders and the respective interests they hold. The court cannot divest itself of knowledge of the operation of the railroad company, the income derived from the operation of the railroad, the amounts required during the three years when it has been in the hands of the court to pay the necessary expenses of operation, and the amounts that would have been required to pay the interest upon the lien secured upon the property; nor can it divest itself of the knowledge which comes from an acquaintance with the earnings of the property while it has been operated as carefully as the receivers were able to operate it, and as economically as they know how to handle it.''

Therefore, we think the burden, in this court, is clearly upon appellants to overthrow the approval of this plan of reorganization by the chancellor and that every reasonable presumption should be indulged in its favor.

We turn now to consider the situation to which this plan was to apply. Thereafter, we will examine the plan itself to determine whether, in the light of the existing situation, it fairly protects the rights of these appellants. In developing this ''situation,'' we will consider only such matters as bear upon the status of appellants as ordinary unsecured creditors. While counsel for appellants contend that they have particular rights because of the character of the contracts involving them, yet we deem that matter finally settled on the former appeal to this court (294 F. 32) wherein the same contention was a major issue and the court there held (as stated by Mr. Justice McReynolds, 271 U. S. at page 450, 46 S. Ct. 550, 70 L. Ed. 1028) appellants ''to be unsecured contract creditors.''

The record is bare of details as to the condition, value or needs of these properties. Appellees seem to have taken it for granted that the knowledge of the chancellor, gained through intimate and extended experience therewith, was sufficient. This is doubtless true in so far as a determination by the chancellor was concerned, but this court is entirely lacking in such experience and, therefore, in such knowledge. The record is unsatisfactory in this regard and not to be commended. On the other hand, appellants declined to introduce any testimony as to the fairness of the plan on the ground that such question should not be determined in connection with the motion to confirm the sale under a bid which included the plan of reorganization. When the court ruled against such position, they asked for no continuance nor extension of the hearing to afford them an opportunity to present evidence bearing on the claimed unfairness of the plan—such as value of the equity in the property and the amount of new money needed, et cetera. We have no doubt of the propriety of the ruling of the chancellor in holding the hearing at that time. Appellants' rights were abundantly protected by according them the right to file their claim, when it should ripen into such through an election by the purchaser to abandon the terminal contract; the passage of the property from the receiver should not have been delayed; and the question of the fairness of the plan could then be determined once for all as to interested parties. There is, however, enough in the record to obtain an outline of the essential matters.

### (b–1) The Situation.

The properties involved are a large railway system operating more than 3,000 miles of trackage extending through or into several states. By September 27, 1915, the old company, or companies, were unable to pay current debts; a bill was filed by an unsecured creditor and a receiver appointed upon that day. Subsequent defaults in bond interest resulted in various foreclosure suits. All of these actions were consolidated in the present cause. On the above date, the old company had outstanding a floating indebtedness of over $2,000,000; owed large sums for materials and supplies; was in arrears in payment of outstanding vouchers for over $1,000,000, issued for ordinary current operations; had no means to meet its immediate operating expenses; many creditors were pressing for payment; numerous suits had been filed wherein attachments and other processes had issued and there was great danger that the lines of railroad would be broken up and its rolling stock and other property taken from it, thereby preventing operation. At that time, it and its constituent properties had outstanding secured indebtedness of about $140,000,000 carrying an annual interest charge in excess of $6,500,000. The same companies had outstanding more than $13,-000,000 of preferred and more than $63,-000,000 of common stock. The final order of sale reveals that the amount of interest then in default on secured obligations was over $33,386,000.

The receiver operated and improved the property. By October 1, 1921, he had made capital expenditures of $17,550,000 for improvement to roadway and structures and $11,450,000 for new equipment and improvements to existing equipment, resulting in improved operating efficiency.

There is no denial nor qualification of the above facts. They reveal a hopelessly embarrassed railway system, necessary to be kept in operation, with a crushing burden of debt, by far the larger amount of which indebtedness was secured by liens. This badly insolvent property had been in receivership for more than six years. There is no hint that continued operation by the receiver could ever have resulted in extrication and the constantly accruing interest on secured indebtedness convinces to the contrary. The creditors (secured and general) and the stockholders had their money in these companies; it had been conclusively demonstrated that the earnings (before and during the receivership) could not possibly take care of the existing obligations; the size and character of the property and business prevented all hope of realization through sale to persons not already involved; the substantial value of the property was as a going concern; the paramount obligation to continue service to the public existed. Clearly, the only thing to be done was for those interested to erect a new financial structure which would involve altered financial and legal relationships to the property. This the Plan of Reorganization was designed to accomplish.

(b-2) · The Plan of Reorganization.

The reorganization of an *insolvent* business involves considerations (practical and legal) not present in the reorganization of a solvent business. Almost always (except to conform to some legal requirement) the latter are voluntary matters of purely business policy, not intended to nor resulting in disturbance of existing legal rights of creditors or stockholders—they are carried through in strict conformity to such rights —the purpose being to better an existing condition. The former are compelled by the inexorable logic of a hard situation; are designed to save as much as may be from impending wreckage and always involve changes in the existing legal rights of some (often all) of those having such rights in connection with the property involved. If the situation could be cared for along lines of the then existing legal rights, no reorganization would be necessary. We are concerned here with a plan which alters the legal rights and relations of every class interested in this property. While our primary concern is with the alteration in the legal rights and relations of general creditors and while our determination must depend upon the relative treatment of such creditors and of the old stockholders, yet the plan is a unit and treatment of the above two classes cannot be comprehended in its entirety unless the whole set-up of the plan be considered.

The plan cared for 21 classes interested in the property—18 classes of secured creditors, unsecured creditors, preferred stockholders and common stockholders. This was to be accomplished through only two grades of mortgage bonds and only two classes of stock. The contemplated mortgages were a prior lien mortgage and a cumulative adjustment mortgage. The prior lien mortgage was to secure an authorized bond issue of $250,000,000, divided into series A bonds (bearing 5 per cent.), series B (bearing 4 per cent.) and series C (bearing 6 per cent.), of which $52,942,752 (series A) and $27,236,000 (series B) were to be issued to care for secured claims; $12,-894,570 (series C) to be offered to stockholders; the remainder, $156,926,678, to be reserved for future use by the new company. The cumulative adjustment mortgage (junior to the prior lien mortgage) was to secure an authorized bond issue of $100,-000,000, interest (not above 7 per cent.) payable only out of net income and cumulative after January 1, 1925, redeemable at par and accrued interest on any interest day and convertible into 7 per cent. preferred stock prior to January 1, 1932; of which $51,973,756 was to be issued in settlement of secured claims and for "other reorganization purposes," $5,526,244 to be offered to stockholders and $42,500,000 reserved for future use by the new company. The preferred stock (in series) was authorized for $200,000,000 in shares of $100 par value, interest (not above 8 per cent.) cumulative after January 1, 1928, with preferential assets rights over common stock; the immediate issue being series A (bearing 7 per cent. interest and redeemable at 110 per cent.), of which $24,500,000 was to be used in settlement of secured claims and for "other reorganization purposes"; the balance of the authorized stock ($175,500,-000) to be issued or reserved for conversion of cumulative adjustment bonds or for future corporate purposes. Common stock authorized was 2,500,000 nonpar shares, of which 20,322 shares to be used in settlement of secured claims and for "other re-

organization purposes," 762,833 shares to be offered to stockholders and 1,716,845 for future corporate purposes.

The terms of participation as to each of the 18 classes of secured obligations, as to general creditors, as to old preferred stock and as to old common stock are set forth in detail. As to the secured obligations it is enough, at this point, to say that the plan is not challenged, varies as to each class and uses prior lien bonds of both series, adjustment bonds, preferred stock (series A), common stock and cash in various combinations and amounts, but in no instance recognized the priority of any secured creditor by offering him new securities of a higher grade than any offered to any class junior to him.

There were two offers, in the alternative, to the unsecured creditors and one each to the preferred and to the common stockholders. The offers to the stockholders and one of the two offers to such creditors were, in essence, purely bond subscription offers. The other offer to the creditors was entirely different. For convenience, the three subscription offers will be considered first. They were as follows:

To *preferred stock,* per 100 shares (par value $10,000), on payment of $20 per share:

(1) $1,400 prior lien mortgage bonds, series C, 6 per cent., carrying interest from January 1, 1922;

(2) $600 adjustment mortgage bonds, series A, 5 per cent., ranking for interest from January 1, 1922;

(3) 100 shares common stock.

To *common stock,* per 100 shares (par value $10,000), on payment of $25 per share:

(1) $1,750 prior lien mortgage bonds, series C, 6 per cent., carrying interest from January 1, 1922;

(2) $750 adjustment mortgage bonds, series A, 5 per cent., ranking for interest from January 1, 1922;

(3) 100 shares common stock.

To *unsecured creditors,* per $100 of claim (claim to include allowed amount, with interest to January 1, 1922) on payment of $18 per $100 of claim, including such interest:

(1) $14 prior lien mortgage bonds, series C, 6 per cent., carrying interest from January 1, 1922;

(2) $6 adjustment mortgage bonds, series A, 5 per cent., ranking for interest from January 1, 1922;

(3) 1 share common stock.

Equalizing the three offers on the basis of the same amount of par or face value ($100 of stock or debt), for purposes of comparison, the results are:

*Preferred stock,* payment of $20 gets:

(1) $14 prior lien bonds;

(2) $6 adjustment bonds;

(3) 1 share common stock.

*Common stock,* payment of $25 gets:

(1) $17.50 prior lien bonds;

(2) $7.50 adjustment bonds;

(3) One share common stock.

*Unsecured creditor,* payment of $18 gets:

(1) $14 prior lien bonds;

(2) $6 adjustment bonds;

(3) 1 share common stock.

Appellants seek to take prices at different times of the two above classes of bonds to show that if the stockholder had gotten his bonds when they were at certain prices and the unsecured creditor had gotten his when they were at certain other prices, the stockholder would have secured an advantage. We think such an argument, using different prices for comparison, is hardly fair and should be given no weight. The market prices varied rather widely as to each of these two classes of bonds, as to the new preferred and as to the new common stock. While such prices have a bearing upon the other offer to unsecured creditors, it has none as to the three subscription offers now being considered. This is true because each of these three subscription offers was of precisely the same ratio ($7 of prior lien, $3 of adjustment and 1 share of common stock) as to each class of bonds and as to the stock offered, therefore, for purely *comparative* purposes as to such offers, the prices are not material. The comparison differences lie here entirely in the relative amounts to be paid and the relative privileges to subscribe. As to the amounts, both classes of old stockholders were required to pay par for each class of bonds; the unsecured creditor obtained the same bonds for 90 per cent. of par. There was a further advantage (both to creditor and preferred stock) over old common stock in that the old common stock was required to subscribe for 25 per cent. more of the bonds than either the creditor or the old preferred stockholder in order to secure one share of the new common stock. As to privileges to subscribe, the basis for all of the old stock was the par value, while the creditor basis was the face value of the claim *plus interest* to January 1, 1922, amounting to slightly over 36 per cent. The inclusion of this interest was a distinct preference to the creditor because it was not

legally allowable if contested. Thomas v. Western Car Co., 149 U. S. 95, 116, 13 S. Ct. 824, 37 L. Ed. 663. The net results of preference allowed the creditor over all of the old stock are that he was permitted an advantage of 36 per cent. on the subscription basis and received the same new bonds and stock for 10 per cent. under the old stock.

The alternative offer to the unsecured creditor was to give him one-third of one share of preferred stock (series A, bearing 7 per cent. and redeemable at 110 per cent.) and two-thirds of one share of common stock (nonpar) for every $100 of indebtedness (principal, plus interest to January 1, 1922—slightly more than 36 per cent.). The evidence shows that since the plan of reorganization was brought out (November 1, 1921) the securities and stocks provided for therein had been dealt in on the New York Stock Exchange. During that time, the high price for preferred stock was $48.75; the low price was $22.75; the price at the date of the offer was $41, and five days before the hearing in the court below was $40.25, per share. Similar prices on a share of common stock were: High, $19.75; low, $7.50; date of offer, $17.50; and five days before the hearing, $15.25. Therefore, the cash values of this offer per $100 of *principal* claim of indebtedness were (including the effect of 36 per cent. of interest thereon) as follows: High, $39.99; low, $17.10; date of offer, $34.43; five days before hearing, $32.04. At the same periods, the net values per share (par value $100) of the offer to old preferred stockholder over the $20 per share required to be paid by him were as follows: High, $17.64; low, $2.55; date of offer, $14.29; five days before hearing, $12.27. As to old common stock, the corresponding net values (above the $25 payment required from the stockholders) per share (par value, $100) were as follows: High, $17.11; low, $1.18; date of offer, $13.48; five days before hearing, $11.52. The above values of the offers to old preferred and common stock are based upon the market values of the two classes of bonds and of new common stock, which three classes made up these offers. A comparison of the above values, using $100 *principal* of the debt claim, one share of old preferred and one of old common stock (each of par value $100), results as follows:

|  | High. | Low. | Offer Date. | Before Hearing. |
|---|---|---|---|---|
| Claim | 39.99 | 17.10 | 34.43 | 32.04 |
| Preferred | 17.64 | 2.55 | 14.29 | 12.27 |
| Common | 17.11 | 1.18 | 13.48 | 11.52 |

When it is considered that this property had gone into receivership because it could not pay current bills; that heavy defaults were made in interest on secured indebtedness; that it had been in receivership more than six years when this plan of reorganization was promulgated; that at the time of promulgation there was outstanding secured or preferred indebtedness, in principal amount, of $146,543,142; that within six weeks thereafter, the accrued unpaid interest thereon had reached $25,252,238 and at the time of the final order of sale $33,386,000; that the capital expenditures by the receiver were only $3,747,762 more than this accrued interest shortly after such promulgation and were less, by $4,386,000, than such interest at the time of the final order; that the old secured indebtedness was of numerous separate liens involving various and large sums; that the plan provided for but two classes of lien obligations and two classes of stock; that the unsecured creditor was offered (by the stock plan) more than twice as much as any of the old stockholders; that the unsecured creditor could obtain this without any obligation to invest; that the stockholders, in order to obtain any participation, were compelled to further invest to the extent of 20 per cent. (old preferred) or 25 per cent. (old common) of the par value of the participating stock, we conclude that there is no doubt as to the fairness of this offer to the unsecured creditor.

We are not to be understood as condemning the subscription offer made to creditors, but we leave that, as above, without further discussion. This we do because, if the creditor has a free choice of two or more offers and either is fair, he cannot complain, even if the other or others be patently unfair.

### Extension of Participation Period.

Under the order of February 9, 1923, permitting appellants to file their supplemental intervening petition and objections to confirmation of the sale, the court allowed appellants:

"Until on or before ninety days after the purchasers at the foreclosure sale, or their successor or successors shall elect (if such election shall be made) not to adopt or continue in force the operating agreement between the defendant, the old company, and the Kansas City Terminal Railway Company and its constituent companies."

That time has probably long since expired during the course of this litigation.

Pending this litigation, it has been impossible for the parties to know what their rights were and, therefore, their obligations thereunder. Hence, that order will be modified to afford appellants an opportunity to exercise their rights to participate in the reorganization. As whatever claim they may have is unliquidated and may be the subject of difference and even of further litigation, the modification will be by adding to the last paragraph of that order as follows: "And also ninety days after final determination (by agreement or otherwise) of the amount or amounts, if any, of the claim or claims of appellants or of any of them."

With the above modification of the above order, the orders and decrees from which this appeal is taken are affirmed.