STATEMENT BY THE COURT.
This was an injunctive proceeding instituted in the Pulaski County Chancery Court by appellee, Missouri Pacific Railroad Company, against appellant, St. Louis Southwestern Railway Company, seeking to enjoin appellant from future use of certain railroad tracks situated in the vicinity of North Little Rock. The pertinent facts leading up to the. controversy are to the following effect:
In the early part of 1916 the Twin City Development Company, a domestic corporation, owned 220 acres *Page 804 
of land adjacent to North Little Rock and lying between the main line of the Missouri Pacific Railroad Company on the north and west and the main line of the Chicago, Rock Island Pacific Railroad Company on the south and east. Said tract of land was also traversed by the old main line of the St. Louis Southwestern Railway Company. The Twin City Development Company conceived the purpose of developing said tract of land into a manufacturing industrial center, and to this end undertook the construction and establishment of a railroad track across said tract of land beginning at a certain point on the Missouri Pacific track and extending in a southeasterly direction to an intersection with the Chicago, Rock Island Pacific Railroad tracks, thereby crossing the track of the old line of the St. Louis Southwestern Railway Company. Immediately after this purpose was asserted, the St. Louis Southwestern Railway Company, appellant in this suit, instituted injunctive proceedings in the Federal court for the Eastern District of Arkansas, and the contemplated improvement was halted by this procedure. Thereupon, the Twin City Development Company, it being without authority under the law to condemn real estate, by its owners and officers organized the Argenta Terminal Railroad Company, which had full authority under the laws of the State to condemn the right-of-way by eminent domain.
Thereafter, on April 20, 1916, the St. Louis Southwestern Railway Company, appellant in this suit, and the Argenta Terminal Railroad Company entered into a contract by the terms of which the railroad company gave permission to the Terminal Railroad Company to build a crossing across its right-of-way and track. The consideration for this contract was that the Terminal Company was to execute in behalf of the St. Louis Southwestern Railway Company the usual crossing contract; that the Terminal Company should execute a bond in the sum of $15,000 payable to the railroad company, signed by the Terminal Company and each of its owners and stockholders, and also signed by the Twin City Development Company and each of its owners and stockholders, *Page 805 
the effect of which was to guarantee the full and faithful performance by the Terminal Company of the terms and conditions of the crossing contract and also the terms and conditions of this contract. On performance of these conditions the St. Louis Southwestern Railway Company agreed to dismiss its suit pending in the United States Federal District Court.
Paragraphs 3, 4, 5 and 6 of this contract read as follows:
"3. The Terminal Company hereby gives and grants to the Railway Company the right to use, at its option, all the tracks and extensions thereof of the Terminal Company between the lines of the St. Louis, Iron Mountain Southern Railway Company and the Chicago, Rock Island Pacific Railway Company, including all spur and side tracks hereafter constructed connecting with or leading out from said line of railroad and extensions thereto, upon the same and equal terms as are now or shall hereafter be granted by the Terminal Company to the said St. Louis, Iron Mountain Southern Railway Company and the Chicago, Rock Island Pacific Railway Company, or to any other railroad company or person firm or corporation, it being distinctly understood and agreed that the Terminal Company shall grant to no other person, firm or corporation any rights or privileges in connection with the use and operation of its said line of railroad as above mentioned that shall not also be granted to and enjoyed by the railway company. And the Terminal Company hereby agrees and binds itself to make no contract or agreement with any other person, firm or corporation which will in anywise prevent the railway company from equal joint use of any and all of the tracks herein mentioned on the terms and conditions herein set forth.
"4. The Terminal Company agrees and binds itself not to sell or convey its said line of railroad or any portion thereof without the written consent of the railway company to St. Louis, Iron Mountain Southern Railway Company or the Chicago, Rock Island Pacific Railway Company, their or its successors and assigns, *Page 806 
or any other trunk line of railroad, but that the entire line of railroad of the Terminal Company shall be at all times hereafter open to the use and operation of the Railroad Company upon the terms and conditions set forth.
"5. The Terminal Company further agrees and binds itself to keep up and maintain in a manner sufficient for the safe operation of the engines, cars and trains of the Railway Company thereover its entire line of railroad, including connecting tracks and extensions, and including the crossing covered by separate contract herein provided for, all as set forth herein, free of cost to the Railway Company, unless the St. Louis, Iron Mountain Southern Railway Company, the Chicago, Rock Island Pacific Railway Company, and the Railway Company, or its or their successors and assigns shall hereafter enter into an agreement among themselves covering the terms and conditions upon which said three trunk lines shall take over and operate the Terminal Company's said railroad, including such crossing. It is expressly understood that, upon the completion by the Terminal Company of its line of railroad as described in paragraph 1 hereof, the Terminal Company shall have the immediate right to permit the use of its said line of railroad by the three lines of railroad hereinabove mentioned upon equal and the same terms for the purpose of switching cars thereon, serving industries or otherwise, the hours of use by each of the said companies exercising the said privilege to be fixed by the Terminal Company, so that neither of the three trunk lines shall have any advantage over the others so exercising said privileges.
"6. It is further understood and agreed by and between the parties hereto that the Terminal Company shall not construct nor permit to be constructed any track or line of railroad connecting with or breaking out from the line mentioned and described in paragraph 2 hereof which may extend off the land or property now owned by the said Twin City Development Company, and that no line of railroad shall be constructed connecting *Page 807 
with or breaking out from the said Terminal Company's main line which may be used to serve any plant, industry, or business, located or to be located off the land now owned by said Twin City Development Company, which land is located on both sides of the Railway Company's old main line and on both sides of the Terminal Company's proposed line of railroad, and consists of one hundred seventy-five (175) acres, more or less, all as is shown by deed or deeds duly recorded in deed records of Pulaski County, Arkansas, to which reference is here made; nor shall the Terminal Company construct, or permit to be constructed, any such track for the purpose of serving any plant, industry or business now served by the railway company."
After the execution of the contract between the railway company and the Terminal Company, the Twin City Development Company, on May 13, 1916, entered into a contract with one O. M. Krebs as trustee (for a corporation to be hereafter formed) by the terms of which a part of the 220-acre tract was conveyed to the trustee. The material provisions of this contract, in so far as this controversy is concerned, are as follows:
"As a part of the contract for the purchase and sale of the said land, the grantor has made and entered into, and does hereby make and enter into, the following covenants and agreements, which are to constitute a part of the terms of the deed from the grantor to the grantee referred to above, and to run with the land thereby conveyed, as fully and completely as if such covenants and agreements had been embodied in extenso in said deed itself, to-wit:
"The grantor further covenants and agrees that it will construct or cause to be constructed a standard gauge railway track connecting with the track of the Chicago, Rock Island Pacific Railway Company, in the southwest quarter of the southwest quarter of said section 26 and extending through the northwest part of the southeast quarter of the southwest quarter and thence in a northerly direction through the northeast quarter of the southwest quarter adjacent and parallel *Page 808 
to the west line of the tract of land herein conveyed (the center of said track to be thirty feet from the said west line of the tract herein conveyed) and thence in a northeasterly direction through the southeast quarter of the northwest quarter and the west half of the northeast quarter of said section 36 to a connection with the track of the St. Louis, Iron Mountain Southern Railway Company in the northwest quarter of the northeast quarter of said section 36, crossing the track of the St. Louis Southwestern Railway Company, and also having a switch connection with said track, in the southwest quarter of the northeast quarter of said section 36, the said track, and the connections with the tracks of the three railroad companies named above, to be located and constructed on the survey as shown by the line on a blue print plat attached to this deed and made a part hereof which plat shows the boundary of the tract of land hereby conveyed, marked with a yellow line. The construction of said track is to be commenced at once, and the work is to be prosecuted as expeditiously as possible, so that the entire track and its connections with the tracks of the railroad companies named herein shall be completed within a reasonable time so as to serve the industrial plant which the grantee intends to establish on said tract of land. The grantor agrees to construct the said track in a first-class manner out of first-class material, and it is to furnish all the labor and material necessary therefor. The grantor undertakes and agrees to procure the consent of the three railroad companies named above to make the necessary physical connection of said track with the respective tracks of said railroad companies.
"The grantor further covenants and agrees that it will, on the completion of said track, offer to convey the same, with the right-of-way on which it is located, in fee simple, to the Chicago, Rock Island Pacific Railway Company, the St. Louis, Iron Mountain Southern Railway Company and the St. Louis Southwestern Railway Company, and to their respective successors and assigns, for their joint ownership and use, on conditions that will require the said railway companies to maintain the said *Page 809 
track in suitable repair and condition, and that each will use it and will operate its locomotives and cars over and upon it in the same manner, to the same extent and on the same tariff charges and rates as if the said track were an industrial track belonging to each of said railway companies, and constituting a part of the railway system of each, and will agree that it will make no switching charge for the delivery to or movement from the grantee's plant on said industrial track of any car which has been transported, or is to be transported by such railway company in a main line haul, so long as free switching service is accorded by such company in connection with a road haul of like commodities to and from the plants that are served by industrial tracks connected with the rails of such company in Argenta or Little Rock. The grantor further covenants that, if such offer is accepted, it will immediately convey the said track and right-of-way to the railway companies named above by a proper deed or other instrument which shall recite the conditions upon which the conveyance is made; but it shall not be necessary to set forth the conditions in the exact language used above and it shall be a sufficient compliance with this covenant if the contract between the grantor and the said railway companies is such as to secure free switching as defined above to the grantee herein.
"The grantor further covenants that, if the three railway companies named above will not accept a conveyance of the track and right-of-way on the conditions specified in the preceding paragraph, it will then offer to lease the said tack and right-of-way to the said railway companies and to their respective successors and assigns, for a period of not less than fifteen years, on the same terms and conditions specified in the preceding paragraph with reference to a conveyance of said track and right-of-way; and will, if such offer is accepted, execute the proper lease or other instrument for that purpose, which shall recite the terms and conditions referred to, and shall contain a provision that the lease shall continue in force after the expiration of the term *Page 810 
specified therein until it is terminated by twelve months' written notice given by either party to the other.
"The grantor further covenants that, if the said railway companies will not accept a lease of the track and right-of-way for the term and on the conditions named above, it will then offer to grant trackage rights over said track to the said railway companies, and to their respective successors and assigns, for a period of not less than fifteen years, and thereafter until such trackage contract is terminated by twelve months' written notice given by either party to the other, on the same conditions with respect to the operation of said track without switching charges for the delivery and movement of cars thereon as are set forth above with reference to a conveyance or lease of said track and right-of-way, except that if the said railway companies will not agree to maintain the track in suitable repair and condition during the term of the trackage contract, the grantor shall maintain the track in such condition during such term. If such offer is accepted, the grantor agrees that it will execute a proper contract with said railway companies for that purpose, which contract shall specifically recite the terms and conditions specified herein.
"It is expressly understood and agreed, however, that the grantor shall not be considered in default with reference to the foregoing covenants to convey or lease the said track and right-of-way, or to grant trackage rights thereon, as long as the track is actually maintained in suitable repair and condition, and the said railway companies or the grantor or any one else is actually serving the plants or industries owned or operated by the grantee on the land described above by delivering and moving cars thereon to and from said plants or industries on the same net tariff charges and rates to the grantee that would be applicable if the said track were an industrial track belonging to each of said railway companies and constituting a part of the system of each.
"The grantor further covenants and agrees that, if all the offers referred to above are rejected by the railway company or companies named herein, and such company *Page 811 
or companies shall refuse to use the said track as if it were an industrial track belonging to its or their system, and without any switching charge for service thereon as specified above, then the grantor will perform or cause to be performed, without cost to the grantee, the switching service defined above during a period of fifteen years from the date of this contract, or during such part of that time as any of said railway companies shall fail or refuse to perform free switching service as contemplated herein. Provided, however, that the grantor may, at the end of five years, at the option of the grantor, cause the capital stock of the Argenta Terminal Company to be transferred in fee to a trustee to be named by the grantee herein, in trust for the grantee and for all persons or corporations who may then or thereafter own any part of the tract of land now belonging to the grantor and situated within the lines marked on the plat hereto attached, the title to which has been or shall be acquired directly or by mesne conveyance from the grantor herein, whose land abuts on said track, or may or shall be connected with said track or other tracks extending therefrom, and who shall agree in writing with said trustee to contribute a just and fair part of the cost of maintaining said track, the amount to be in proportion to the comparative use of said track, and who shall further agree in writing with said trustee to indemnify and save harmless all other users of said track for all damage or injury caused by or due to the act of the user causing such damage. On the assignment and transfer of the said stock to a trustee as aforesaid, the grantor's guaranty of free switching shall be considered as fully satisfied and discharged, and its obligation in that behalf shall be at an end.
"The grantor further covenants and agrees that it will maintain said track in first-class condition until its maintenance is assumed by others in one of the ways specified herein, but upon the execution of a conveyance or lease to the railway companies named herein or upon the execution of a maintenance assumption trackage contract with said railway companies, on the terms and conditions *Page 812 
specified herein, upon the transfer of the stock of the Argenta Terminal Company to a trustee as provided herein, the obligation of the grantor to repair and maintain the said track shall cease and terminate, and such obligation shall not continue in any event for a longer period than fifteen years."
The Krebs contract covered approximately fifteen acres of land, and, in addition thereto, two strips of land, 25 feet wide for a right-of-way from the mill site to the terminal railroad track. Thereafter the trackage of the terminal railroad company was completed and the sawmill, known as the McLean-Arkansas Lumber Company, was built. These two contracts were performed by the parties in interest up to and until April 3, 1924, at which time the physical properties of the Argenta Terminal Railroad Company were purchased by the Missouri Pacific Railway Company. This deed recites a cash consideration of $20,000 and the assumption of the terms and agreements of the contract entered into between the Twin City Development Company and the Krebs contract of May 13, 1916; this deed recites, referring to the contract as aforesaid, "which expires May 13, 1931, etc." Immediately after May 13, 1931, appellee served notice upon appellant that its rights to the use of this trackage had ceased and terminated on May 13, 1931, and that thereafter it would be required to pay the usual and customary tariffs accruing by reason of its use. Appellant ignored the contents of this notice, and this suit was brought by the Missouri Pacific Railway Company in the Pulaski County Chancery Court to enjoin the St. Louis Southwestern Railway Company from using its track without permission, and the court, after hearing the testimony, entered its decree, enjoining appellant from further use of the track without the consent of appellee. Other facts will be referred to in the opinion.
(after stating the facts). It is perfectly clear from the Krebs contract of May 13, 1916, that *Page 813 
all the right and interest of appellant expired at the expiration of fifteen years from the date thereof, to-wit: May 13, 1931. It suffices to say that appellant enjoyed the full benefits of this contract up to the date of its expiration without let or hindrance by appellee or its predecessor in title, the Argenta Terminal Company.
It is next insisted that the contract of date April 20, 1916, between the Argenta Terminal Railroad Company and the St. Louis Southwestern Railway Company created covenants and conditions which ran with the land, and therefore appellant has a perpetual right to use this trackage without compensation. We cannot agree to this construction of the contract. We think that it is fairly inferable from this contract that it was the intent of the parties to create only a personal liability and responsibility thereunder. This, because the parties stipulated that a bond in the sum of $15,000 would be executed by the Argenta Terminal Railroad Company in favor of appellant guaranteeing the performance of the terms and conditions of this contract. If there has been a breach of this contract by the parties, then appellant would pursue its remedy against this bond.
In 22 R.C.L., at page 1094, it is said
"Where a contract for a traffic arrangement, made between two railroad companies, declares that the contract and any damages for the breach of the same shall be a continuing lien upon the roads of the contracting parties, this does not constitute a lieu running with the land, when, by the due course of law, it has passed into other hands, although it may be a valid contract personally enforceable between the parties. Although money due for unpaid services under the contract might be a lien on the income or property of the delinquent company, yet conjectural damages which might result to ones company during the remainder of the time the contract had to run, by the failure of the other company to keep it, are not a specific lien on the property, which attached to it and follow it into the hands of a purchaser. By a mortgage executed by one company, on all its property, to secure its bonds, to a trust company, as trustee, the title *Page 814 
to the property passes to the trust company, without having attached to it the lien of the contract for the traffic arrangement."
In the case of Detroit T. I. R. Co. v. Detroit T. S. L. R. Co., 6 F.2d 845, the Circuit Court of Appeals held:
"A contract between two railroad companies, by which one grants to the other the right to use certain trackage, does not run with the land, but is merely personal between the parties, and not binding on the successor of one through foreclosure proceedings, unless adopted by it."
In the case of Kansas City Terminal Ry. Co. v. Central Union Trust Company of New York, 294 F. 32, the court held: "Contracts between railroad companies for the joint ownership and use of a union station are ordinary executory operating contracts, and not covenants which run with the property of the several companies and follow it into the hands of subsequent purchasers."
Many other decisions of State and Federal courts might be cited to the same effect. By implication, at least, this court has announced a similar doctrine wherein it held:
"A purchaser of the roadbed, property and franchises of a railroad company is not liable for its obligations which are not liens upon the property." Sappington v. L. R. M. R. T. R. Co., 37 Ark. 23.
It is next insisted on behalf of appellant that, notwithstanding the Krebs contract may have terminated, and notwithstanding the court might determine that the contract of April 20, 1916, was personal between the parties, yet appellee had no right to purchase this track as it did in 1924, because of paragraphs 18, 20 and 22 of 1, title 49 U.S. Code.
Paragraph 18 provides: "No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall have been *Page 815 
obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation of such additional or extended line of railroad."
Paragraph 20 reads as follows:
"Any construction, operation or abandonment contrary to the provisions of this paragraph or of paragraph 18 of this section, may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph 18 of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both."
Paragraph 22 provides:
"The authority of the commission conferred by paragraphs 18 to 21, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or sidetracks, located or to be located wholly within one State."
It will be noted that paragraph 22 creates an exception to the general provisions as found in paragraphs 18 and 20, in this that it exempts from the operation of paragraphs 18 and 20 "of spur, industrial, team, switching, or sidetracks, located or to be located wholly within one State."
The testimony introduced in this cause convinces us that it was never the purpose or intention of the parties who owned this small amount of trackage to engage in commerce or the transportation of freight. The Argenta Terminal Railroad Company never owned or operated any rolling stock, engines or cars: it had no operating force; it had no trackage other than this small industrial switch track, which was less than a mile in length. It never promulgated or participated in any revenues from freight over either of the railroads to which it was connected. *Page 816 
We believe a fair preponderance of the testimony shows that this trackage is nothing more nor less than an industrial or spur track and comes clearly within subdivision 22 of 1, title 49, U.S. Code.
The question here presented as to the necessity for application to the Interstate Commerce Commission for authority to purchase or Construct an extension of a railroad line was presented and decided by this court in the case of St. Louis Southwestern Railway Company v. Missouri Pacific Railroad Company, 185 Ark. 824, 49 S.W.2d 1054, wherein the court held:
"After a careful reading and analysis of the evidence adduced in the instant case, the court has concluded that the proposed improvement is a spur within the meaning of paragraph 22, and not an extension of the line of appellee's railroad within the meaning of paragraph 18. The proposed improvement being a spur only, it was unnecessary to obtain a certificate of convenience and necessity for a crossing from the Interstate Commerce Commission before appellee could file its application before the Railroad Commission of Arkansas to fix the place and manner of the crossing."
We think that the language used by this court quoted above is controlling in this case on the question involved.
The question as to whether or not the small trackage in controversy was an extension of line or a spur or industrial track was purely a question of fact, and, since the trial court has determined that issue in favor of appellee and its findings are supported by a preponderance of the testimony, it is binding upon this court.
Let the judgment be affirmed.